JODI LINKER
Federal Public Defender
Northern District of California
ANGELA CHUANG
SAMANTHA JAFFE
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    (415) 436-7700
Facsimile:    (415) 436-7706
Email:        Angela_Chuang@fd.org
Email:        Samantha_Jaffe@fd.org

Counsel for Defendant Ranney

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 25–416 TSH |
| Plaintiff, | **DEFENDANT'S MOTION TO SUPPRESS, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION** |
| v. | |
| CALEB ALEXANDER RANNEY. | **Court:**        Courtroom E, 15th Floor |
| Defendant. | **Hearing Date:**  July 9, 2026 |
| | **Hearing Time:**  10:00 a.m. |

PLEASE TAKE NOTICE that defendant Caleb Alexander Ranney hereby moves this Court for an order suppressing all fruits of the unlawful seizure of his person and seizure and search of his property on August 8, 2025. The motion is based on this notice and motion, the following memorandum of points and authorities, the accompanying declaration and exhibits, the Fourth Amendment to the United States Constitution, all other applicable constitutional, statutory, and case authority, and such evidence and argument as may be presented at the hearing of this motion.

This case is set for a hearing on July 9, 2026.

DEF.'S MOTION TO SUPPRESS
*RANNEY*, CR 25–416 TSH

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND............................................................................................. 1

    I.    Search of Mr. Ranney's person................................................................... 2

    II.    Search of Mr. Ranney's backpack ............................................................... 3

    III.    Transport of Mr. Ranney's property ........................................................... 5

    IV.    Defense inquiries into property................................................................... 6

ARGUMENT ................................................................................................................. 7

    I.    The seizure of Mr. Ranney's gloves was unconstitutional. ........................... 8

    II.    The search of Mr. Ranney's backpack and subsequent seizure of items from it was unconstitutional. ................................................................................... 9

        A.    The "inventory search" exception does not apply, first because Mr. Ranney was only processed for a citation and release, and second because the purpose of the search was investigatory in nature. ................................................. 10

        B.    The "search incident to arrest" exception does not apply because the backpack was outside of Mr. Ranney's immediate control when it was searched ............. 12

    III.    In ruling on Mr. Ranney's motion to suppress, the Court should draw an adverse inference against the government for its failure to preserve evidence........................... 14

CONCLUSION............................................................................................................. 16

# TABLE OF AUTHORITIES

**Federal Cases**

*Arizona v. Gant,*
    556 U.S. 332 (2009) ................................................................................ 7-8, 12, 13

*Chimel v. California,*
    395 U.S. 752 (1969) ................................................................................ 12

*Colorado v. Bertine,*
    479 U.S. 367 (1987) ................................................................................ 10

*Coolidge v. New Hampshire,*
    403 U.S. 443 (1971) ................................................................................ 9-10

*Florida v. Wells,*
    495 U.S. 1 (1990) ................................................................................ 10

*Horton v. California,*
    496 U.S. 128 (1990) ................................................................................ 9

*Illinois v. Lafayette,*
    462 U.S. 640 (1983) ................................................................................ 10

*Katz v. United States,*
    389 U.S. 347 (1967) ................................................................................ 7-8, 9

*Soldal v. Cook County, Illinois,*
    506 U.S. 56 (1992) ................................................................................ 8-9

*South Dakota v. Opperman,*
    428 U.S. 364 (1976) ................................................................................ 10

*Terry v. Ohio,*
    392 U.S. 1 (1995) ................................................................................ 12

*Thornton v. U.S.,*
    541 U.S. 615 (2004) ................................................................................ 13

*U.S. v. Magdirila,*
    962 F.3d 1152 (9th Cir. 2020) ................................................................................ 10

*United States v. Anderson,*
    101 F.4th 586 (9th Cir. 2024) ................................................................................ 10, 11

*United States v. Caseres,*
    533 F.3d 1064 (9th Cir. 2008) ................................................................................ 8, 13

*United States v. Cervantes,*
    703 F.3d 1135 (9th Cir. 2012) ................................................................................ 8, 10

*United States v. Cook*,
808 F.3d 1195 (9th Cir. 2015) ................................................................ 12, 13, 14

*United States v. Davis*,
332 F.3d 1163 (9th Cir. 2003) ................................................................ 8

*United States v. Flyer*,
633 F.3d 911 (9th Cir. 2011) ................................................................ 14

*United States v. Johns*,
891 F.3d 243 (9th Cir. 1989) ................................................................ 8

*United States v. Johnson*,
889 F.3d 1120 (9th Cir. 2018) ................................................................ 11

*United States v. Jones*,
565 U.S. 400 (2012) ................................................................ 7

*United States v. Loud Hawk*,
628 F.2d 1139 (9th Cir. 1979) ................................................................ 14, 15

*United States v. Rodgers*,
656 F.3d 1023 (9th Cir. 2011) ................................................................ 10

*United States v. Scott*,
705 F.3d 410 (9th Cir. 2012) ................................................................ 8, 9-10

*United States v. Sivilla*,
714 F.3d 1168 (9th Cir. 2013) ................................................................ 14, 15

*United States v. Twilley*,
222 F.3d 1092 (9th Cir. 2000) ................................................................ 8

*United States v. Vasey*,
834 F.2d 782 (9th Cir. 1987) ................................................................ 8, 10

*United States v. Washington*,
490 F.3d 765 (9th Cir. 2007) ................................................................ 8

*United States v. Wilson*,
13 F.4th 961 (9th Cir. 2021) ................................................................ 9

*Warden v. Hayden*,
387 U.S. 294 (1967) ................................................................ 9

*Wong Sun v. United States*,
371 U.S. 471 (1963) ................................................................ 8

**Other Authorities**

Fourth Amendment to the United States Constitution ................................................................ *passim*

DEF.'S MOTION TO SUPPRESS
*RANNEY*, CR 25–416 TSH

iii

## INTRODUCTION

On August 8, 2025, Mr. Ranney attended a pro-immigration rights protest in San Francisco. The protest was held outside 630 Sansome Street, a federal building that houses an immigration court and where Immigration, Customs, and Enforcement ("ICE") temporarily holds immigration detainees. Mr. Ranney was arrested at that protest and ultimately cited and released. Before his release, he, and his backpack, were thoroughly searched. Some of the items on his person and from his backpack were returned. Some items, including a pair of motorcycle gloves, were confiscated, and now cannot be found, leading the defense to believe they were either lost or destroyed. No inventory form or property list or any other document describing what was searched and what was confiscated has been produced. When the defense inquired about the items, the government proceeded to ask ICE and FPS officers if they knew where the items were or who performed the search. To date, all federal officers asked about the items or the search claimed ignorance of the whereabouts of those items or of who specifically performed the search. Yet, from surveillance video produced by the government, multiple agents can be seen searching Mr. Ranney and his backpack, and taking custody of the items themselves. Their statements to the contrary are false.

It is undisputed that ICE and FPS did not have a warrant to search Mr. Ranney's backpack, nor seize property from his person. The seizure of property from his person and search and seizure of items in his backpack were unconstitutional. The fruits of them must be suppressed, and this Court should take an adverse inference against the government due to its failure to preserve that property.

## FACTUAL BACKGROUND[1]

After Mr. Ranney's arrest outside of 630 Sansome Street he was taken inside the building, where he and his property were searched. Footage from multiple internal cameras was produced to the defense in discovery. Jaffe Decl.; Exhibits A, B, C, F, G (filed under seal pursuant to protective order). This footage shows law enforcement searching Mr. Ranney's person, seizing property from him, and searching his backpack, and seizing property from it, all without a warrant.

---

[1] The following recitation of the facts surrounding Mr. Ranney's arrest does not constitute an admission to the veracity of those facts. Facts presented in this section are drawn from discovery materials. Mr. Ranney reserves the right to contest the facts as presented following further investigation or other proceedings.

DEF.'S MOTION TO SUPPRESS
*RANNEY*, CR 25–416 TSH

1

## I.    Search of Mr. Ranney's person

Mr. Ranney, and a petite middle-aged woman who was also arrested,[2] were both taken inside the building for processing. Mr. Ranney can be seen in the surveillance footage on the right of the frame with his face against the wall, and his backpack on. Ex. A at 00:05-1:28. Two officers[3] search him initially: they remove what appears to be a keffiyeh from his backpack and toss it onto a table behind them. *Id.* at 1:28-1:33. They remove something else and toss it into a trash can. *Id.* at 1:34-1:38. They remove various items and place them on a table. *Id.* at 2:09-2:28. They throw away something else from what appears to be either his backpack or pants pocket. *Id.* at 2:39-2:42.

A different officer removes the balaclava from Mr. Ranney's head and drops it on the table. *Id.* at 3:38-3:43. He is turned around so he is no longer facing the wall. *Id.* at 3:49-3:51. There is no audio, but it is clear that he is being asked questions and is nodding in response. *Id.* at 3:53-3:58. Something else is placed on the table. *Id.* at 4:33-4:35. Another officer removes Mr. Ranney's backpack, and hands it to a different officer, Supervisory Detention Deportation Officer ("SDDO") Andrew Kaskanlian, who places it on the table. 4:46-4:55. That same officer removes Mr. Ranney's sweatshirt or jacket. *Id.* at 4:54-5:17. In the process, Mr. Ranney removes his gloves, and hands them to the officer who removed his balaclava, who places them on the table. *Id.* at 5:01-5:09.

Kaskanlian takes what appears to be the backpack and Mr. Ranney's sweatshirt or jacket off the table, and hands them to ICE Officer Joe Love, who exits the frame through a door on the right side. *Id.* at 5:17-5:22. Six officers remain in the hallway with Mr. Ranney and the other detained person. Mr. Ranney is kneeling on the floor, unlacing his shoes. He gives the laces to the officers, who place them on the table. *Id.* at 5:17-7:02. The officer who took the balaclava and gloves then pats Mr. Ranney down. *Id.* at 7:40-8:21. Mr. Ranney is walked through a door to the left, presumably into a holding cell. *Id.* at 9:07. An officer closes the door, and another officer appears to lock it. *Id.* at 9:32-9:50. Another officer unlocks that door, goes inside, and then reemerges and relocks it. *Id.* at 11:17-

---

[2] It bears noting that throughout the footage showing the search of Mr. Ranney, the petite middle-aged woman, is forcibly pushed and shoved against the wall at multiple points while she is also being searched, causing her to be in visible distress. *See, e.g.*, Exhibit A at :27-38; 2:00-2:30; 3:08-3:17; 5:56-6:04; 9:32-9:34; 9:49-9:51.
[3] There are at least four and often more agents present during the search of Mr. Ranney and the petite middle-aged woman.

DEF.'S MOTION TO SUPPRESS
*RANNEY*, CR 25–416 TSH

2

11:27. Mr. Ranney does not reemerge on the footage. There is no evidence Mr. Ranney was fingerprinted, photographed, or booked into custody in any way.

## II.     Search of Mr. Ranney's backpack

Another angle, from a camera inside the room where the backpack was taken (the door on the right in Exhibit A), shows the first few searches of Mr. Ranney's backpack. Kaskanlian walks into the main office space with the other officer who he handed the items to, who is wearing khakis. Exhibit B at 04:54–05:00. The officer in khakis sets the jacket and backpack down on a table in the office space and proceeds to open the backpack. *Id.* at 05:03–05:07. Because the officer is standing with his back to the camera and with the backpack in front of him, it is difficult to make out exactly what he is doing with the items he finds inside the backpack. *Id.* The officer takes several items out of the backpack, inspecting them before setting them down on the table. *Id.* at 05:07–06:25. He is not wearing gloves. *Id.* at 5:07-7:01. The officer steps to his right, showing to the camera that he has laid out the items inside of Mr. Ranney's backpack on the table. *Id.* at 06:26. The officer continues his search, and picks a few items off the ground and places them on the table. *Id.* at 06:27–07:09. A few moments later, a different ICE officer approaches, and the two converse for a while. *Id.* at 07:20–08:24. The two officers then walk away from the table and out of the room, with Mr. Ranney's belongings on full display. *Id.* at 08:24–08:27. There are several moments where there are no officers in the room and Mr. Ranney's belongings are wholly unsupervised. *See id.* at 08:50–09:20.

Later, another ICE officer walks to the table and inspects Mr. Ranney's belongings as they are strewn out on the table. *Id.* at 09:17–09:45. At one point, the officer pulls a stick-like object from his utility belt and pokes certain items on the table. *Id.* The officer then walks away, leaving the room and the belongings unattended once more. *Id.* at 09:46–10:01. Several officers mill around the room, without securing or inventorying the items on the table. *Id.* at 10:02–12:00.

Officers then begin to gather in the back of the office space, away from Mr. Ranney's belongings. *Id.* at 12:20. Among them are District Commander Scott Hall with the Federal Protective Service ("FPS"), and FPS Inspector Joseph Orchard. Approximately eight officers stand in a circle conversing for the remainder of the footage. *Id.* at 12:20–15:00. While the officers are conversing, a different officer walks into the room, goes up to the table where Mr. Ranney's belongings are placed,

and physically inspects some of the items before stepping away. *Id.* at 13:40–13:50. Another officer places the other detained person's sneakers on the table next to Mr. Ranney's items and appears to search them. *Id.* at 12:57-14:35. At the end of Exhibit B, Mr. Ranney's belongings are still loose on the table. *Id.* at 15:00. At no point on Exhibit B did any of the officers involved fill out paperwork of any kind.

A camera on the opposite side of the room where Mr. Ranney's backpack is searched captured a different angle, and additional searches. Jaffe Decl.; Exhibit C. The beginning of Exhibit C is duplicative of Exhibit B, just from a different angle. The officer in khakis and Kaskanlian bring the backpack and jacket, but no other items, into the room. Ex. C at 00:00-00:09. The officer in khakis, without gloves, removes items from the backpack and lays them on the table. He drops something on the floor, picks it up, and places it back on the table. *Id.* at 00:09-2:20. Another officer enters the room and approaches the officer in khakis, and the officer in khakis picks up what appears to be an American flag from the backpack. *Id.* at 2:25-2:35. The footage shows the searches described *supra* from a different angle.

Orchard comes to the table right next to the property and starts filling out citations. Another officer brings what appears to be an ID to him, while he fills out paperwork. He takes a photo of the ID on the table, which is next to Mr. Ranney's property, and makes a phone call. *Id.* at 14:22–20:54. Hall approaches Orchard, and Mr. Ranney's property. *Id.* at 15:12-15:23. Hall stands next to the property, across the table from Orchard, while Orchard makes a phone call, and makes a call himself. *Id.* at 15:23- 20:20. Following the phone call, Orchard takes a seat to the right of the items and fills out citation forms, and then gets up. *Id.* at 20:54–1:18:16. He returns and continues with the forms. 1:24:30-1:37:00. Hall walks around the table and sits next to Orchard, who is next to Mr. Ranney's property. *Id.* at 20:25-20:40. Hall remains next to Orchard, who is next to the property, and Orchard's empty chair when Orchard leaves the room briefly. *Id.* at 20:40-1:37:00.

After the citation forms are filled out, three officers huddle around the items, including Orchard, with Hall sitting at the table next to them. They are soon joined by five more ICE officers walking in. *Id.* at 1:38:45–1:38:50. Hall and Orchard are among those standing around the property. *Id.* at 1:38:51–1:46:03. One officer grabs hold of what appears to be several spray paint cannisters

DEF.'S MOTION TO SUPPRESS
*RANNEY*, CR 25–416 TSH

4

and sets them to the side. *Id.* at 1:46:05–1:46:13. Afterwards, a different officer takes these cannisters and puts them inside of a brown paper bag, on the upper left of the screen. *Id.* at 1:46:06–1:46:44. The officer who originally grabbed the paint cannisters also grabs something from the table and drops it inside of the paper bag. *Id.* The officer loading the paper bag removes the items from it so a different officer can take a picture of the items, using her cell phone, and then returns items to the paper bag. *Id.* at 1:46:30-1:47:20. Hall and Orchard look on from next to the property on the table while all of this occurs.

Mr. Ranney is then walked back into the office, hands in the air, led by Kaskanlian and another officer. *Id.* at 1:47:16–1:47:19. He is sat down at the table next to his items, and appears to be speaking with Hall and Orchard. *Id.* at 1:47:20–1:50:48. Hall oversees another officer who reaches into the backpack and pull items out of it, and then repacks it. *Id.* at 1:49:00-1:50:11. *Id.* Orchard puts what appear to be two pieces of paper in the backpack. *Id.* 1:50:32-1:51:14. Mr. Ranney is then returned his backpack, jacket, and boots and escorted out of the room. *Id.* at 1:52:02–1:52:16. The paper bag, with Mr. Ranney's confiscated property inside, remains on the table in the upper left of the frame. *Id.*

Per the ICE ERO report in this case, the officer who searched the backpack found "a gas mask, cans of spray paint and tools." Jaffe Decl; Exhibit D at 2. It also notes that those listed items were seized by the Federal Protective Service as "evidence." *Id.* The ICE ERO report does not mention the gloves removed from Mr. Ranney's person.

Photographs of the property were produced in discovery. Jaffe Decl.; Exhibit E.  The first photograph shows a U.S. flag, a gas mask, a flashlight, a keffiyeh, a cell phone, a wallet, hand sanitizer, a pair of motorcycle gloves, what looks like a marker, headphones, and a pair of work boots. *Id.* at 1. The second photograph shows what the ERO report designates as the confiscated items, namely: four cans of spray paint, and what appears to be three pairs of pliers. *Id.* at 2. The last photograph is of a pair of "moto sports" brand gloves with what looks like black plastic covering the knuckles and finger joints. *Id.* at 3.

**III.    Transport of Mr. Ranney's property**

Two short videos, produced in discovery, show Orchard and Hall walking down a hallway and

then into an elevator bank. Jaffe Decl.; Exhibits F, G. In both, Orchard holds a brown paper bag, which appears to be the same brown paper bag the seized property was placed in. Ex. C at 1:46:06-1:52:16. There is no evidence of what happened to the seized property next.

**IV.    Defense inquiries into property**

The defense first inquired about Mr. Ranney's property on December 19, 2025, the day of Mr. Ranney's initial appearance. Jaffe Decl.; Exhibit H at 19. In response, the government asked all agents involved about their knowledge of the search and seizure of the property, and of their knowledge of the whereabouts of the seized property. *See* Jaffe Decl., Exhibit H (Combined Property Emails). The responses uniformly declared ignorance of any search being conducted or any property being seized. Specifically, Scott Hall, the District Commander for the Federal Protective Service, wrote that he "was not in possession of [Mr. Ranney's] property" nor did Hall "remember seeing his property." *Id.* at 1. This is contradicted by the video evidence, which shows Hall in the room with the property for over an hour, overseeing the backpack get unpacked and repacked, and accompanying Orchard with the brown paper bag filled with seized items. *See generally* Ex. C; *see also* Ex. C at 1:46:06-1:52:16; Exhibit F; Exhibit G.

FPS Inspector Joseph Orchard wrote that he "was not present during the Ranney/Scott arrests" and that he "did not search or inventory the subjects or their belongings." Ex. H at 6. To the contrary, Orchard is next to Mr. Ranney's property for over an hour. Ex. C at 14:22-1:52:00. He puts what look like two discrete pieces of paper into Mr. Ranney's backpack after it has been unpacked and repacked. *Id.* at 1:50:32-1:51:14. He also holds a brown paper bag when walking down a hallway and towards an elevator bank that matches the brown paper bag the items seized from Mr. Ranney and his backpack were placed in. Exhibit F; Exhibit G. Orchard and Hall's statements regarding their involvement in the search, seizure, and processing of Mr. Ranney's property thus appear to be false.

ICE ERO Supervisor Andrew Kaskanlian wrote that "ERO does not have processing paperwork" and that he believes "FPS took down a report and issued a citation." Ex. H at 7. As noted *supra*, it does not appear that Mr. Ranney was fingerprinted, photographed, or booked, but that he

was rather processed for a citation from the point of his arrest onwards.[4]

**ARGUMENT**

"The Fourth Amendment provides in relevant part that '[t]he right of the people to be secure in their persons, houses, papers, and effect, against unreasonable searches and seizures, shall not be violated.'" *United States v. Jones*, 565 U.S. 400, 404 (2012) (quoting U.S. Const. amend. IV). Mr. Ranney's person plainly falls within the protection of the Fourth Amendment, as does his backpack.

It is a bedrock principle that warrantless searches and seizures "'are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S.

---

[4] The National Detention Standards ("NDS") establish mandatory, uniform guidelines for conditions of confinement, operations, and management relating to detention within the ICE agency. These standards are publicly available on ICE's government website. *See* https://www.ice.gov/detain/detention-management/2026. Jaffe Decl.; Exhibit I. NDS Standard 2.1 governs ICE policy for the admission of new detainees into ICE or ICE contractor custody. Standard 2.1, Section II, Subsection B. Search of Detainee and Property, states that "[e]ach new arrival will be searches in accordance with Standard 2.7 "Searches of Detainees." Further, it states:

> [a]ll items discovered during the search will be categorized as funds, valuables, or other personal property, to be retained by the detainee or *inventoried, receipted, and stored*. Items classified as contraband will be handled appropriately, in accordance with Standard 2.4 "Funds and Personal Property," and Standard 2.3 "Facility Security and Control."

Ex. I at 27. Additionally, Standard 2.1, Section II, Subsection J. Releases, states that prior to a detainee's release from an ICE facility, staff must completed all required procedures, "including forms, closing files, fingerprinting, returning personal property . . ." *Id.* at 29.

Standard 2.4 governs the mandatory ICE procedures for the control and safeguarding of detainee property. Section II, Subsection A. It states that "[t]he facility shall provide a secure area, accessible only by designated supervisors and/or property officers, to hold detainee property, valuables, and foreign currency." This section also states that any unauthorized detainee property is considered "contraband" and will be confiscated for "securing and inventorying." *Id.* at 37.

Finally, Section II, Subsection D. Inventory and Audit, reads in whole:

> Facilities shall establish a written procedure for the inventory and audit of detainee funds, valuables, and personal property. For recordkeeping and accounting purposes, use of the G-589 Property Receipt or an equivalent form is mandatory to document any funds removed from a detainee's possession, including the amount and type of currency. Detainees must be provided with a receipt for all property held until release.

*Id.* at 38.

---

DEF.'S MOTION TO SUPPRESS
*RANNEY*, CR 25–416 TSH

347, 357 (1967)). "The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *See United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012); *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012) ("Because warrantless searches and seizures are per se unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement."). The government must prove the lawfulness of a warrantless seizure or search by a preponderance of the evidence. *See United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987) ("The government must prove the existence of an exception to the Fourth Amendment Warrant Requirement by a preponderance of the evidence."). If the government does not carry its burden, all fruits of the warrantless search must be suppressed. *See, e.g.*, *United States v. Caseres*, 533 F.3d 1064, 1076 (9th Cir. 2008) (reversing district court's denial of motion to suppress because government did not carry its burden of justifying warrantless search).

Mr. Ranney submits that the government will fail to meet its burden here, and therefore, all evidence obtained as a result of the seizure and search of his person and property, including photographs of Mr. Ranney's backpack and the items found on his person and inside of the backpack, must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).[5]

## I.    The seizure of Mr. Ranney's gloves was unconstitutional.

The Supreme Court has long made clear that the constitutionality of the seizure of items is an inquiry distinct from the question of whether the preceding search was itself constitutional. *See*, *e.g.*, *Soldal v. Cook County, Illinois*, 506 U.S. 56, 65–66 (1992) (discussing "plain-view" seizures in

---

[5] "It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible. . . unless the evidence obtained was 'purged of the primary taint.'" *United States v. Washington*, 490 F.3d 765, 775 (9th Cir. 2007) (quoting *Wong Sun*, 371 U.S. at 488; *see also United States v. Davis*, 332 F.3d 1163, 1170–71 (9th Cir. 2003) (stating that "the standard articulated in *Wong Sun* remains the relevant test"). "The question is whether, granting establishment of the primarily illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Johns*, 891 F.3d 243 (9th Cir. 1989). In addition, "the government has the burden to show that the evidence is not 'the fruit of the poisonous tree." *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000).

DEF.'S MOTION TO SUPPRESS
*RANNEY*, CR 25–416 TSH

which law enforcement lawfully access an area and seize an item therein, explaining that such seizures "have been scrupulously subjected to Fourth Amendment inquiry"); *Warden v. Hayden*, 387 U.S. 294 (1967). Thus, even if the police have conducted a lawful search, they still must have probable cause to seize personal property without a warrant. *Soldal*, 506 U.S. at 65–66 (explaining that "in the absence of consent or a warrant permitting the seizure of the items in question, such [plain-view] seizures can be justified only if they meet the probable cause standard"); *Warden*, 387 U.S. at 307 ("There must, of course, be a nexus . . . between the item to be seized and criminal behavior . . . . Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction"). Additionally, for a warrantless seizure of items to be justified, "its incriminating character must also be 'immediately apparent.'" *Horton v. California*, 496 U.S. 128, 136–37 (1990) (internal citations omitted).

Here, law enforcement seized (and, apparently, lost or destroyed) Mr. Ranney's gloves. The gloves, which the defense has not inspected and has only received two photos of, appear to be "moto sports" brand gloves with what looks like black plastic covering the knuckles and finger joints. Ex. E at 3. The gloves were not evidence of any crime that had been alleged. Nor was there probable cause to believe they were contraband: to the contrary, it appears none of the officers on scene remember searching Mr. Ranney or his backpack or seizing any of his property at all. Ex. H. It strains credulity to imagine that, while not remembering any search or seizure, they were somehow immediately aware that the gloves themselves were contraband.

## II.    The search of Mr. Ranney's backpack and subsequent seizure of items from it was unconstitutional.

The warrantless search of the backpack was unconstitutional, and the evidence must be suppressed. Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Scott*, 705 F.3d at 416 (quoting *Katz*, 389 U.S. at 357; *accord United States v. Wilson*, 13 F.4th 961, 971 (9th Cir. 2021) (observing "'the most basic constitutional rule' in the Fourth Amendment arena: warrantless searches are per se unreasonable, subject to few exceptions that are 'jealously and carefully drawn'" (quoting *Coolidge*

*v. New Hampshire*, 403 U.S. 443, 454–55 (1971))). A warrantless search is unreasonable—and therefore unlawful—unless the government proves that an exception applies. *See, e.g.*, *United States v. Rodgers*, 656 F.3d 1023, 1027–31 (9th Cir. 2011) (finding warrantless search of vehicle unlawful where no probable cause that vehicle contained evidence of a crime). Here, the government will be unable to prove that any exception to the warrant requirement applies.

> **A.      The "inventory search" exception does not apply, first because Mr. Ranney was only processed for a citation and release, and second because the purpose of the search was investigatory in nature.**

As a threshold matter: it is undisputed that after Mr. Ranney was searched and placed in a holding cell, FPS Inspector Orchard began and completed citation paperwork. Ex. C at 14:22-1:37:00. Mr. Ranney was not booked, nor fingerprinted. There is no evidence that any law enforcement agency ever intended to actually take him into custody. Accordingly, the requirements for an inventory search are not met.

The "inventory search" exception to the fourth amendment warrant requirement holds that police may search the personal belongings of an arrested person, so long as they are "in accordance with established inventory procedures." *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983); *see U.S. v. Magdirila*, 962 F.3d 1152, 1157 (9th Cir. 2020). This exception was established by the Supreme Court because it served societally valuable administrative goals, such as the "protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (citations omitted); *Florida v. Wells*, 495 U.S. 1, 4 (1990) (quoting *Colorado v. Bertine*, 479 U.S. 367, 372 (1987)). However, "given the nature of the inventory-search exception to the warrant requirement. . . [t]o satisfy the Fourth Amendment, an inventory search must serve administrative, not solely investigatory, goals." *United States v. Anderson*, 101 F.4th 586, 600 (9th Cir. 2024). It is the government's burden to show that the search was administrative, not investigatory in nature, as it is their burden to show that any exception to the warrant requirement applies by a preponderance of the evidence. *Cervantes*, 703 F.3d at 1141; *Vasey*, 834 F.2d at 785. The government cannot meet that burden here.

The government cannot establish that the search was administrative because, first, there is no

evidence that any law enforcement agency actually processed Mr. Ranney to detain him, and, second, ICE did not comply with its stated inventory search procedures. *See supra* n. 7. ICE policy mandates the "inventory and audit" of detainee funds, valuables, and personal property of detainees upon admission into ICE custody. It also mandates that the property be held in a secure area, "accessible only by designated supervisors and/or property officers." *Id.*

Those procedures were not followed here, which is "objective evidence" that "suggest[s] that the intrusion was made not for the purpose of enforcing the administrative inspection scheme." *Anderson*, 101 F.4th at 594 (noting that when a defendant challenges law enforcement's motivations for an alleged inventory search, they must point to objective evidence in support of the idea that the search was not done for the purpose of administrative inspection enforcement). This "objective evidence of pretext" then means this Court "must assess the officers' subjective intent to determine whether the requirements of the inventory-search exception are met" because the ultimate burden of proof regarding the application of the inventory search exception lies with the government. *Id.*

In this case, no inventory was produced. The backpack was searched in the middle of an ICE office, and items were left strewn about where there was heavy foot traffic. Several items from Mr. Ranney's bag and person were lost, even after the agency made efforts to locate the items. *See* Ex. H. The items included spray paint canisters, pliers, and motorcycle gloves. Ex. E. These items were clearly confiscated by ICE and not returned to Mr. Ranney. Ex. C at 1:46:06–1:46:44; 1:47:50–1:52:16 (showing the items in question being separated from the rest of Mr. Ranney's property, placed in a paper bag, and showing Mr. Ranney being escorted out of the room without the items); Ex. F & G (showing FPS officers walking with what appears to be the same paper bag).

The Ninth Circuit has been clear that "the purpose of an [inventory search] is to *produce an inventory*." *Anderson*, 101 F.4th at 595 (quoting *United States v. Johnson*, 889 F.3d 1120, 1125 (9th Cir. 2018)) (internal quotations omitted). It thus is of extreme concern that in this case, law enforcement not only failed to create an inventory, and not only failed to safeguard Mr. Ranney's property, but the government has also failed to identify the officer(s) who executed the search of Mr. Ranney's backpack. In fact, multiple officers claimed ignorance of any search being conducted or any items being seized, which is contradicted by the video evidence. *See* Ex. H. The officers'

DEF.'S MOTION TO SUPPRESS
*RANNEY*, CR 25–416 TSH

11

purpose in searching Mr. Ranney and his backpack without any intention to hold him in custody was investigatory, the administrative rational of the inventory search exception, which requires an arrest, is not satisfied, and thus the inventory search exception does not apply.

**B.    The "search incident to arrest" exception does not apply because the backpack was outside of Mr. Ranney's immediate control when it was searched**

First, as noted *supra*, Mr. Ranney was detained in custody, but was not actually booked in or processed to be held longer than temporarily. There is nothing in the reports or videos that has been produced that evinces any such intent to hold him overnight or take him to jail, rather than the temporary ICE holding cell. Absent an arrest, the "search incident to arrest" exception does not apply.

Furthermore, the "search incident to arrest" exception to the fourth amendment warrant requirement is limited to "a search of the arrestee's person and the area 'within his immediate control'— construing that phrase to mean the area from within which [the arrestee] might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 762-763 (1969); *United States v. Cook*, 808 F.3d 1195, 1199 (9th Cir. 2015) ("In evaluating the reasonableness of a search incident to arrest, we have examined . . . whether the area searched was within the arrestee's 'immediate control.'") Whenever officers seek to search an area outside of this zone of immediate control, where "there is no possibility an arrestee could reach into the area . . . ", the "search incident to arrest" exception's twin justifications—officer safety and preservation of evidence—do not exist, and thus the exception does not apply. *Gant*, 556 U.S. at 339.

In addition to the spatial limitation set forth by the "immediate control" doctrine, the Supreme Court has also suggested that there is a scope limitation to the search incident to arrest exception. The scope of a search must be "'strictly tied to and justified by' the circumstances which rendered its initiation possible." *Terry v. Ohio*, 392 U.S. 1, 19 (1995) (citation omitted). Because the justification for this exception is officer safety and the preservation of evidence, searching the area in the immediate control of an arrestee falls well within the bounds of the *Terry* court's limitation of scope. *Chimel*, 395 U.S. at 763. By contrast, the exception's scope is exceeded if the officers search a room other than the one in which the arrest occurred, or if they "search[] through all the desk drawers or

other closed or concealed areas in that room itself." *Id.* Such in-depth searches, even if of the room where the suspect was arrested, require a search warrant in the absence of other warrant exceptions. *Id.* The Ninth Circuit has also suggested that the exception is more likely to apply if the scope of the search is brief, such that it only serves to ensure officer safety and the preservation of evidence. *Cf. Cook*, 808 F.3d at 1200 ("[A]s soon as Officer Knight determined that the backpack contained no weapons, he immediately stopped the search . . . [this] ensured that the search was 'commensurate with its purposes of protecting arresting officers and safeguarding any evidence.'") (quoting *Gant*, 556 U.S. at 339)).

In this case, even assuming that Mr. Ranney was actually arrested, the government will be unable to establish that the search incident to arrest exception applies to Mr. Ranney's backpack because Mr. Ranney's backpack was searched far outside of his immediate control. Mr. Ranney's backpack was searched in a common area located in the 6th floor of 630 Sansome Street after being taken off of his person. Ex. B at 4:54–6:27. At the time that it was removed from his person, Mr. Ranney was in a hallway surrounded by several armed ICE agents, some of whom were holding him by the arm or shoulder. Ex. A at 00:05–5:09. The backpack was removed from Mr. Ranney's body and handed to a different officer, who then walked out of the hallway, into the common area, to a table located on the opposite side of the common area from the room, and began to search through the backpack. Ex. B at 4:54–5:10. The fact that the bag was an entire room away, separated by several armed ICE agents physically restraining him, places the bag far outside of Mr. Ranney's "immediate control." Though Mr. Ranney's handcuffs were removed in order to take the backpack and jacket from him, and so he could unlace his shoes, the backpack was then immediately placed on a table out of his reach and then taken into a separate room. Thus, the circumstances in that moment meant that there was no danger of him using any weapons or destroying any evidence hypothetically present in his backpack "unless he 'possessed of the skill of Houdini and the strength of Hercules." *United States v. Caseres*, 533 F.3d 1064, 1072 (9th Cir. 2008) (quoting *Thornton v. U.S.*, 541 U.S. 615, 626 (2004) (Scalia, J., concurring)).

Additionally, the government will be unable to establish that the search incident to arrest exception applies because the search of Mr. Ranney's backpack was not limited in scope to the

justifications of the search incident to arrest exception. In *Cook*, the Ninth Circuit found it significant that the officer who searched the defendant under the search incident to arrest exception did so "within twenty to thirty seconds," and that "as soon as Officer Knight determined that the backpack contained no weapons, he immediately stopped the search." 808 F.3d at 1200. Unlike in *Cook*, in this case the ICE officers initially searched Mr. Ranney's backpack for far over three minutes. The property was on the table for almost two hours. They did not stop the search upon discovering that there was no evidence of the crime for which he was charged. The items inside the backpack were then searched again, after having been left strewn on the table for over an hour after the first few various searches. The searches here far exceeds the justifications for the search incident to arrest exception, and as such the exception does not apply.

**III.    In ruling on Mr. Ranney's motion to suppress, the Court should draw an adverse inference against the government for its failure to preserve evidence**

It is undisputed that the property the government seized (cans of paint, pliers, the motorcycle gloves) was either lost or destroyed and has not been made available to the defense. Jaffe Decl.; Ex. D (ICE Ero Report); Ex. B (Processing Footage); Ex. C (Processing Footage). It is also undisputed that after the defense inquired into the whereabouts of Mr. Ranney's property, the government asked all the agents involved about any search and seizure of the property. The agents' responses uniformly declared ignorance of any search or any seizure of the property. Jaffe Decl.; Ex. H (Combined Property Emails). This Court should draw a negative inference on that point, in favor of suppression of all evidence seized from Mr. Ranney's person and backpack, because the government not only failed to preserve the evidence, but the agents' responses as to the property are demonstrably false. *United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013).

In determining whether an adverse inference is warranted, courts consider "the quality of the Government's conduct and the degree of prejudice to the accused." *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc) (Kennedy, J., concurring) (overruled in part on other grounds); *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) (citing *Loud Hawk*). The government bears the burden of justifying its conduct and the accused of demonstrating prejudice. *Id.* (Kennedy, J., concurring).

It cannot be disputed that the government failed to preserve this evidence. To start, the property was either lost or "destroyed while in [government] custody." *Id*. Second, the government "acted in disregard for the interests of the accused." *Loud Hawk*, 628 F.2d at 1152. As noted *supra*, defense counsel has requested information about the property since the date of Mr. Ranney's initial appearance. The defense clearly communicated this interest from the case's inception. The property has either been lost or destroyed, and the government's agents have disavowed any knowledge of the search and seizure, statements which, when viewed in conjunction with video evidence, are false. Ex. H (Combined Property Emails). The government has an obligation to preserve relevant evidence, particularly after such evidence is requested by the defense. For the government to allow such evidence to be lost or destroyed with no attempt to preserve it, and then for government agents to make false statements about their role in the search and seizure of the evidence, rises to the level where at least an adverse inference is warranted.

The government's actions have prejudiced the defense. The defense has had no opportunity to actually inspect any of the seized property, and the government believes the photographs of it are relevant and are including them in its exhibit list for trial. *Loud Hawk*, 628 F.3d at 1152. "[T]he probative value and reliability of the secondary or substitute evidence," three photographs, is minimized where, as here, the defense has had no opportunity to actually inspect the evidence itself. *Loud Hawk*, 628 F.3d at 1152. In *Sivilla*, the Ninth Circuit found that the sale of the defendant's vehicle, in which drugs were purportedly found, prejudiced the defense because photographs of the vehicle were "pixelated" and "difficult to decipher." 714 F.3d at 1174; *cf. Loud Hawk*, 628 F.2d at 1155 (Kennedy, J., concurring) (the existence of photographs of the destroyed evidence mitigated the prejudice to defendant). Here, there are only three photographs and the actual physical characteristics of the objects are not entirely apparent from them.

Because the government's conduct in failing to preserve this evidence was unjustified and negligent, and particularly in light of numerous law enforcement officers lying, via email, about their involvement in the search of Mr. Ranney and his backpack and the seizure of his property, Mr. Ranney is entitled, at a minimum, to an adverse inference to inform the court's decision on his

motion to suppress, including in assessing the government witnesses 'credibility, if applicable.[6] As noted in the separately filed motions in limine, the defense also seeks the remedy of dismissal, or a lesser remedy of exclusion, with the ability to cross-examine the agents about their statements which are plainly contradicted by the video evidence.

**CONCLUSION**

For the foregoing reasons, Mr. Ranney respectfully requests that the Court hold an evidentiary hearing on all contested issues of fact and suppress all fruits of the warrantless search of his person and backpack and seizure of his property.

June 24, 2026
Dated

JODI LINKER
Federal Public Defender
Northern District of California

/S
SAMANTHA JAFFE
Assistant Federal Public Defender

[6] The Ninth Circuit Model Criminal Jury Instructions state: "If you find that the Government intentionally [destroyed]" evidence "that the Government knew or should have known would be evidence in this case, you may infer, but are not required to infer, that this evidence was unfavorable to the Government." Model Crim. Jury Instr. 9th Cir. 3.19, Lost or Destroyed Evidence (2023).

DEF.'S MOTION TO SUPPRESS
*RANNEY*, CR 25–416 TSH