JODI LINKER, Bar Number 230273
Federal Public Defender
Northern District of California
ANGELA CHUANG, Bar No. 313445
SAMANTHA JAFFE, Bar No. 324739
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Angela_Chuang@fd.org
Email: Samantha_Jaffe@fd.org

Counsel for Defendant Ranney

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>CALEB ALEXANDER RANNEY.<br>Defendant. | **Case No.:** CR 25–416 TSH<br>**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO SUPPRESS**<br>**Court:** Courtroom E, 15th Floor<br>**Hearing Date:** July 9, 2026<br>**Hearing Time:** 10:00 a.m. |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

SUPPLEMENTAL FACTUAL BACKGROUND ..... 2

ARGUMENT ..... 3

I. Mr. Ranney was arrested, but was not processed to be held any longer than temporarily. ..... 3

II. The search of Mr. Ranney's backpack is too attenuated from the arrest to be a search incident to arrest and is unconstitutional. ..... 3

A. The seizure of the paint cannisters and tools from the backpack are also not supported by probable cause and is unconstitutional. ..... 8

III. The seizure of Mr. Ranney's gloves was not supported by probable cause and is unconstitutional. ..... 9

IV. The search of Mr. Ranney's backpack cannot be an inventory search, nor does inevitable discovery apply. ..... 10

V. The exclusionary rule applies here. ..... 12

VI. Mr. Ranney is entitled to, at a minimum, an adverse inference based on the government's spoliation of evidence. ..... 13

A. Mr. Ranney has shown that that government agents acted in bad faith. ..... 13

B. The lost/destroyed items were potentially exculpatory and no adequate substitute exists. ..... 15

C. The sanctions Mr. Ranney requests are appropriate ..... 17

CONCLUSION ..... 18

# TABLE OF AUTHORITIES

## Federal Cases


*Arizona v. Gant*,
556 U.S. 332 (2009) ........ 5

*California v. Acevedo*,
500 U.S. 565 (1991) ........ 4

*Chimel v. California*,
395 U.S. 752 (1969) ........ 4

*Chimel, Gant, and Preston v. United States*,
376 U.S. 364 (1964) ........ 8

*Davis v. United States*,
564 U.S. 229 (2011) ........ 12

*Elkins v. United States*,
364 U.S. 206 (1960) ........ 12

*Horton v. California*,
496 U.S. 128 (1990) ........ 9, 10

*Nix v. Williams*,
467 U.S. 431 (1951) ........ 11

*United States v. Anderson*,
101 F.4th 586 (9th Cir. 2024) ........ 11

*United States v. Camou*,
773 F.3d 932 (9th Cir. 2014) ........ 6, 12, 13

*United States v. Chadwick*,
433 U.S. 1 (1977) ........ 4, 5

*United States v. Guzman-Guerrero*,
2016 WL 10951813 (E.D. Wash. March 2, 2016) ........ 7

*United States v. Loud Hawk*,
628 F.2d 1139 (9th Cir. 1979) ........ 17, 18

*United States v. Maddox*,
614 F.3d 1046 (9th Cir. 2010) ........ 7

*United States v. Sivilla*,
714 F.3d 1168 (9th Cir. 2013) ........ 16

*United States v. Tarazon*,
989 F.2d 1045 (9th Cir. 1993) ........ 3, 4

*United States v. Wills*,
316 F. Supp. 3d 437 (D.D.C. August 8, 2018). .......... 7-8, 8

*United States v. Zaragoza-Morerira*,
780 F.3d 971 (9th Cir. 2015) .......... 15, 17

*Warden v. Hayden*,
387 U.S. 294 (1967) .......... 9

**Federal Rules and Statutes**

Fed. R. Evid. 403 .......... 9

Fed. R. Evid. 404 .......... 9

**Other Authorities**

DHS Warrantless Home Entry Memo's Fourth Amendment Problem, Brennan Center for Justice (Feb. 4, 2026) (available at https://www.brennancenter.org/our-work/analysis-opinion/dhs-warrantless-home-entry-memos-fourth-amendment-problem) .......... 12

## INTRODUCTION

In its response to the motion to suppress, the government argues: 1) officers had probable cause to arrest Mr. Ranney; 2) the search of his person and backpack was justified as a search incident to arrest; 3) the seizure of the gloves from his person "was permissible because it was evidence of his identify and willfulness in damaging the sallyport garage door"; 4) the search of his backpack and seizure of items from it "was the inevitable result of an inventory search"; and 5) even if the searches and seizures contravened the Fourth Amendment, the exclusionary rule is inappropriate. Dkt. 46, Govt Opposition ("Govt Opp") at 4. The government further argues that no evidentiary hearing is necessary, and Mr. Ranney is not entitled to an adverse inference from this Court based on the government's loss or destruction of the seized items. *Id.*

As described *infra*: 1) while the officers may have had probable cause to arrest Mr. Ranney, they did not process him to hold him any longer than temporarily; 2) the search of Mr. Ranney's backpack is not permissible as a search incident to arrest because the relevant inquiry involves Mr. Ranney's ability to gain control of the backpack and its contents; 3) the seizure of the gloves was not permissible as evidence of identity (and would not be relevant as such: different agents have made different factual descriptions of gloves), the gloves were unequivocally lost or destroyed, and agents have lied about their involvement in the search and seizure; 4) the search of Mr. Ranney's backpack and seizure of items from within it does not fit within the inventory search exception nor the inevitable discovery exception because no inventory was produced, the items were not saved or processed as either evidence or personal property, and Mr. Ranney himself was not processed to be held longer than temporary; and 5) suppression of evidence is appropriate here. Finally: based on the government's loss or destruction of the property upon which it seeks to rely at trial, Mr. Ranney is absolutely entitled to an adverse inference from this Court. Further, a material fact here is who searched and seized (and presumably, lost or destroyed) the items in question. The identity of that government officer and their exact actions are absolutely material here, and are disputed: as noted in the materials attached to the initial motion, all officers have denied any involvement, even though video footage shows otherwise.

## SUPPLEMENTAL FACTUAL BACKGROUND[1]

Mr. Ranney was taken to the ground outside of 630 Sansome Street after he allegedly pushed an ICE agent. Dkt. 42, Chuang Decl., Exs J-L; Dkt. 46-1, Cohen Decl., Ex. A. He was handcuffed and taken into the building, escorted by multiple officers. Dkt. 46-1, Cohen Decl., Ex. A at 4:52-6:56; Ex. G at :32-1:11. The officers left his backpack on. Dkt. 46-1, Cohen Decl., Ex. G at :32-1:11. He was then taken from the ground floor of the building to the sixth floor. To get there, he was taken up through an elevator, accompanied by multiple officers and the other arrestee, while handcuffed. His backpack was still on his back. Declaration of Samantha Jaffe in Support of Defendant's Reply ("Jaffe Reply Decl."), Ex. J (Elevator Footage). He was taken to the sixth floor hallway, where the searches commenced, his gloves were removed, and his backpack taken into another room and searched, intermittently, for approximately two hours. Dkt. 39 (Motion to Suppress) at 2-5; Dkt. 33-1, Jaffe Decl., Ex. A. The gloves were initially put back in the backpack along with most of Mr. Ranney's property, Dkt. 33-2, Jaffe Decl., Ex. B at 21:27–22:35, then removed and placed into the paper bag with the paint cannisters and tools. *Id.* at 1:46:05-1:52:16.

The government has conceded that Mr. Ranney's "gloves did not in and of themselves constitute contraband. . . ." Govt Opp. at 6. Further, contrary to the government's arguments that the gloves were evidence, the government's own agents have stated that they did not handle anything of evidentiary value: When Federal Protective Services ("FPS") Inspector Joseph Orchard was interviewed on June 30, 2026, he stated that he does not remember handling or taking any evidence or property, he has nothing to show that he transferred or possessed any items to evidence, and he does not "think that the items are evidence, or he would have logged them as evidence." Jaffe Reply Decl., Ex. K (Excerpted Witness Interview Notes), at 6. When ICE Agent Michael Caldwell, who took Mr. Ranney to the ground, was interviewed, he "stated the purpose of searches of searches is to look for prohibited items including weapons, ammo and knives since they are in a secure area." *Id.* at 4. He also said the gloves were seized at the request of FPS Commander Scott Hall. *Id.* at 2, 4. Hall

---

[1] The following recitation of the facts surrounding Mr. Ranney's arrest does not constitute an admission to the veracity of those facts. Facts presented in this section are drawn from discovery materials. Mr. Ranney reserves the right to contest the facts as presented following further investigation or other proceedings.

was not on-scene when Mr. Ranney was searched and the gloves were initially removed. Dkt. 33-1, Jaffe Decl. Ex. A. As noted in the initial motion, multiple officers, including Hall and Orchard, have lied about their handling of his property. Dkt. 33-8, Jaffe Decl, Ex. H; Jaffe Reply Decl., Ex. K at 6.

## ARGUMENT

### I. Mr. Ranney was arrested, but was not processed to be held any longer than temporarily

As noted in the initial motion: Mr. Ranney was handcuffed, searched, and placed in a holding cell on the sixth floor of 630 Sansome Street. He was not booked into custody. He was not fingerprinted. Orchard began preparing citation paperwork for him shortly after he was placed in the holding cell. He also could not have been held for longer than 12 hours at 630 Sansome Street. *Sequen, et. al. v. Albarran, et. al.*, 25-cv-06487-PCP, Dkts. 138, 205 (granting class certification for plaintiffs' and granting plaintiffs' motions for partial summary judgment, vacating the challenged policies, which blocks ICE from arresting noncitizens at immigration courthouses and limiting the ability of detainees to be held at temporary detention facilities for more than 12 hours).

### II. The search of Mr. Ranney's backpack is too attenuated from the arrest to be a search incident to arrest and is unconstitutional

The government makes too much of the language in *United States v. Tarazon*, which cites *United States v. Turner* for "the following two prong test: (1) was the item to be searched within the arrestee's custody and control; and (2) did the events following the arrest make the search unreasonable." 989 F.2d 1045, 1051 (9th Cir. 1993) (citing 926 F.2d 993, 887–88 (9th Cir. 1991). Govt Opp at 6.

What the government ignores in *Tarazon*, however, is the rationale the court gave: law enforcement entered the establishment following a tip from a previously-arrested drug dealer who told them there were more drugs inside. *Tarazon*, 989 F.2d at 1049–51. Law enforcement first "believed the front desk could contain destructible evidence. . . officials searched the drawers of the desk Tarazon and Serna were sitting behind when they were arrested. The desk drawers were clearly within Tarazon's and Serna's control at the time they were arrested. Second, Tarazon and Serna were placed on the floor near the front desk, and the search occurred only moments after the arrest." *Tarazon*, 989 F.2d at 1051. The holding in *Tarazon* is predicated on the background principle that it is only "reasonable for the arresting officer to conduct a prompt, warrantless 'search of the arrestee's

person and the area within his immediate control[,] construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.'" *United States v. Chadwick*, 433 U.S. 1, 14 (1977) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)) (*overruled on other grounds by California v. Acevedo*, 500 U.S. 565 (1991)). "[W]arrantless searches of . . . property seized at the time of an arrest cannot be justified as incident to that arrest either if the search is remote in time or place from the arrest, or no exigency exists." *Acevedo*, 500 U.S. at 571. The rationale exists to prevent evidence destruction and for officer safety, neither of which is a concern here. The government has submitted no declaration substantiating either, nor could it.

Here, the backpack was not an area from which Mr. Ranney might gain possession of a weapon or destructible evidence: the probable cause supporting Mr. Ranney's arrest was not in a room where law enforcement could not observe it, rather, it happened in plain view and the alleged victim is an ICE officer. Mr. Ranney was tackled to the ground, ICE Officer Caldwell laid on top of him, and then handcuffed, brought to his feet, marched (surrounded by multiple officers) into the building, taken in an elevator up to the sixth floor, un-handcuffed so the backpack could be removed, the backpack was taken into another room, and only then was it searched. None of the exigency in *Tarazon* occurred here: the alleged assault had already taken place, the backpack is very clearly zipped close on the camera footage, and video footage shows Mr. Ranney did not reach into the backpack. Law enforcement left the backpack on Mr. Ranney's back for minutes after he was taken to the ground, laid on top of, pulled back to his feet, and marched into the building and up to the sixth floor. It also bears noting that a backpack on someone's back is not actually within their reaching distance: in order to get something out of a backpack or put something in a backpack, one would have to take it off one's back and reach inside. That simply did not happen here.

Courts have found that temporal and spatial distance can attenuate a search following an arrest such that the search incident to arrest exception does not apply. In *United States v. Chadwick*, Amtrak officials reported two men loading a 200-lb. footlocker onto a train headed to Boston from San Diego. 433 U.S. 1 (1977) (abrogated on other grounds by *California v. Acevedo*, 500 U.S. 565 (1991)). The locker was leaking talcum powder, which was commonly used to mask the odor of marijuana. *Id.* at 4. Federal agents in Boston released a drug dog near the locker, saw the dog alert to

the presence of drugs, and watched the two men carry the locker to a car waiting outside. *Id.* Once the two men were in the car, they were arrested along with the driver. *Id.* Federal agents took the footlocker to a federal building and searched it, without a warrant. *Id.*

The Supreme Court found that the search was unconstitutional. *Id.* at 15–16. "[T]he search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody; the search therefore cannot be viewed as incidental to the arrest or as justified by any other exigency." *Id.* at 15. The Court noted that, from the moment of the arrest, "the footlocker remained under the exclusive control of law enforcement officers at all times." Like the backpack in this case, the footlocker and luggage "were placed in [a] Federal Building, where, as one of the agents later testified, "there was no risk that whatever was contained in the footlocker trunk would be removed by the defendants or their associates.'" *Id.* Here, as in *Chadwick*, "the agents had no reason to believe that the footlocker contained explosives or other inherently dangerous items, or that it contained evidence which would lose its value unless the footlocker were opened at once. Facilities were readily available in which the footlocker could have been stored securely; it is not contended that there was any exigency calling for an immediate search *Id.* Thus, in the Court's view, "when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority." *Id.* Here, too: no exigency. The backpack was removed from Mr. Ranney's back and placed in the other room under the exclusive control of federal agents.

In *Arizona v. Gant*, the Supreme Court reaffirmed that the inability to access the property to be searched was a critical part of the search incident to arrest inquiry. 556 U.S. 332 (2009). Mr. Gant was arrested for driving with a suspended license. He was then handcuffed and placed in the back of a patrol car. *Id.* at 335. Police then searched his car and a jacket inside it, and found cocaine in the pocket of the jacket. *Id.* "Because Gant could not have accessed his car to retrieve weapons or evidence at the time of the search" the search-incident-to-arrest exception could not justify the search of the jacket. *Id.* So too, here, Mr. Ranney could not access the backpack at the time of the search: it had been removed from him and placed in the other room. And, as noted *supra*, there has been no assertion that the search was necessary to prevent the destruction of evidence or for officer safety.

In *United States v. Camou*, the Ninth Circuit reaffirmed the search incident to arrest exception requires that the searched item be within the arrestee's immediate control at the time of arrest and that the search must be spatially and temporally incident to arrest. 773 F.3d 932, 937 (9th Cir. 2014). In *Camou,* US Border Patrol stopped a truck driven by Mr. Camou at a checkpoint. *Id.* at 935. His girlfriend was in the passenger seat, and the two were smuggling Mr. Martinez-Ramirez, an undocumented migrant, in the backseat. *Id.* USBP agents asked to open the rear door after noticing that Camou's girlfriend was nervous, at which point they discovered Mr. Martinez-Ramirez. *Id.* Following their discovery, the agents arrested the three at about 10:40 PM, and seized Camou's truck and cell phone. *Id.* After interrogating the three and obtaining testimony that Camou had engaged in smuggling before, Agents searched Camou's cell phone at about 12:00 AM, one hour and twenty minutes after he was arrested. *Id.* at 936. The agents "did not assert that the search was necessary to prevent the destruction of evidence or to ensure his or anyone else's safety." *Id.*

The court held that the search was not incident to arrest because, along with the presence of several intervening circumstances, the search of the cell phone was not "roughly contemporaneous with Camou's arrest," as is required by Ninth Circuit caselaw. *Id.* at 939. "[I]n determining whether the contemporaneity requirement is met, the focus is upon whether the arrest and search are so separated in time or by intervening acts that the latter cannot be said to have been incident to the former." *Id.* at 938. (internal quotation omitted). The court found several intervening circumstances between the arrest and the search that made the delay unreasonable, including but not limited to: the fact the defendants were restrained; the fact that they were moved into law enforcement headquarters; the fact that the cellphone was inventoried; the fact that defendants were already booked; and the fact that the defendants were already interviewed. *Id.*

Here, the intervening acts are as follows: Mr. Ranney was tackled to the ground outside of 630 Sansome; Mr. Ranney was held down by an agent for minutes on the ground; Mr. Ranney was handcuffed, and walked by multiple agents into the building; Mr. Ranney was taken up, via elevator, to the sixth floor; Mr. Ranney's backpack was removed from his person; Mr. Ranney's person was searched; Mr. Ranney's backpack was placed in another room entirely; minutes then passed before even the initial search began.

In *United States v. Maddox*, the Ninth Circuit held that a search of a key chain was unreasonable, and not a search incident to arrest even though the key chain "was within Maddox's immediate control while he was arrested" because "subsequent events—namely Officer Bonney's handcuffing of Maddox and placing Maddox in the back of the patrol car—rendered the search unreasonable." 614 F.3d 1046, 1048 (9th Cir. 2010). The Ninth Circuit distinguished *Turner*, Govt Opp. at 6, on the grounds that in that case, there were "legitimate concerns for the officers' safety" because they "had already discovered a concealed weapon beneath the bedding." *Id.* In this case, as in *Maddox*, subsequent events (Mr. Ranney being handcuffed, marched into the building with the backpack on, searched and separated from the backpack, and temporal distance between the events) mean that this search was in violation of the Fourth Amendment.

Finally, district courts have denied suppression of searches of backpacks specifically, even when they were within reaching distance of arrestees. *See, e.g.*, *United States v. Guzman-Guerrero*, 2016 WL 10951813 (E.D. Wash. March 2, 2016). Mr. Guzman-Guerrero was suspected of being a drug trafficker and was spotted near the US-Canada border. Federal agents knew at this time he has at least some involvement with a plot to smuggle drugs across the US-Canada border. *Id.* at *1. Federal agents searched the area and found him hiding in underbrush. His backpack was "observed to the defendant's immediate right." *Id.* A drug dog then alerted to the presence of narcotics, and he was arrested for probable possession of a controlled substance. *Id.* At this point, the defendant was "lying on the ground, face-down, and handcuffed." *Id.* Before the backpack was moved, but after the defendant was placed in handcuffs, a Border Patrol agent opened the zipper of the backpack "six inches" and saw cellophane wrapped bricks. *Id.* "Agent Lindsey testified that he did not order Agent McElheran to "peek" into the backpack due to a concern that Defendant might gain access to any contents, but instead due to the possibility that the backpack might contain dangerous materials that could harm the agents during transport." *Id.* The district court held that, under these circumstances, "it was not reasonable for Agent McElheran to perform even a cursory search of Defendant's backpack." *Id.* at *4. "The pertinent inquiry is, instead, the defendant's ability to gain control of the bag and any contents." *Id.*

Though out-of-circuit and non-binding, *United States v. Wills* is also nonetheless instructive.

316 F. Supp. 3d 437 (D.D.C. August 8, 2018). In *Wills*, the district court considered whether the search of a backpack, which was still on Mr. Wills' back, was a proper search incident to arrest. *Id.* at 448–49. The district court properly determined that under *Chimel*, *Gant*, and *Preston v. United States*, 376 U.S. 364 (1964), "if there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." *Id.* (citing *Chimel*, 395 U.S. at 763). The district court, in analyzing whether a closed backpack on the arrestee's back could be searched, analyzed the following factors: whether the defendant was handcuffed or otherwise restrained; the location of the backpack in relation to the defendant; whether the defendant was difficult to restrain or had resisted arrest; whether the arresting officer had reason to suspect the defendant was armed; whether there were other officers nearby to assist; and the thoroughness and length of the search. *Id.* at 449. In *Wills*, the district court held that even though Mr. Wills had run from police, the backpack was on his back, and they suspected he had been armed, the exception did not apply because Mr. Wills was 1) handcuffed; and 2) "would have had to engage in significant acrobatics in order to gain access to the contents of his backpack at the time it was searched" and thus "there does not appear to have been any realistic possibility that Mr. Wills could have accessed the contents of his backpack at that time." *Id.* The analysis leads to the same result here: Mr. Ranney was handcuffed (and then placed in a holding cell), his backpack was closed and in such a place that he could not access it without "significant acrobatics," (first on his back, later in a separate room), there was no reason to suspect he was armed, there were many officers nearby to assist, and the searches were haphazard, done without reliance on any procedures defense counsel can ascertain, and occurred over the course of two hours.

The search of Mr. Ranney's backpack was simply not a search incident to arrest because of myriad intervening circumstances. The search was unconstitutional.

**A. The seizure of the paint cannisters and tools from the backpack are also not supported by probable cause and is unconstitutional**

Even if this Court were to find that the search was proper, as noted *infra* Sec. III, the probable cause requirement is necessary both for the search and for the seizure of items during that search. Officers lacked probable cause to believe that the items they seized from the backpack would aid

them in investigation or conviction: they seized paint cannisters and tools, neither of which is implicated in either of Mr. Ranney's charges, and both of which are legal to possess. As described *infra* at Sec. III, there needs to be probable cause to seize personal property: the evidence must somehow aid in investigation or conviction, and the incriminating nature of that evidence must be "immediately apparent." *Horton v. California*, 496 U.S. 128, 136–37 (1990); *Warden v. Hayden*, 387 U.S. 294, 307 (1967).

The government's theory of relevance for the paints and tools is tenuous at best and makes little sense—they claim that somehow, paint cans and pliers/wire cutters inside a closed backpack somehow are "evidence of his mental state when kicking the door . . . in that he came prepared with tools to deface and cause damage." Govt. Opp. at 8. None of that follows from the undisputed facts. Footage shows that Mr. Ranney never took out either the paints or the tools; in fact, footage shows he never opened his backpack. He did not use the paints or the tools in any way on the door or anything else. Indeed, he did not use the paints or the tools on anything during the protest, let alone "to deface and cause damage." The only reason to introduce such irrelevant evidence would be to paint Mr. Ranney as a "bad person" who has a propensity to vandalize things, which is clearly prohibited under Rule 403 and Rule 404(b).

## III. The seizure of Mr. Ranney's gloves was not supported by probable cause and is unconstitutional

The government cites myriad cases about the propriety of a search of a person incident to arrest. Govt Opp. at 5–6 (citing *Gant*, *Smith*, *Rawlings*, *Tarazon*, *Turner*, and others). But as the government's caption properly demonstrates (Govt. Opp at 5), the constitutional question here is whether the seizure of the gloves, not the search of Mr. Ranney, complies with the Fourth Amendment's dictates.

An arrest supported by probable cause allows for a search incident to that arrest (that is, one that is temporally linked, animated by concerns about destruction of evidence or officer safety, and without intervening circumstances, *see supra* Sec. II). It does not, without more, allow for a seizure of personal property found during that search. Put another way: the seizure is distinct, constitutionally, from the search of Mr. Ranney's person. The officers needed to have probable cause

"to believe that the evidence sought will aid in a particular apprehension or conviction" to seize personal property without a warrant. *Hayden*, 387 U.S. at 307. And, as noted in the initial motion, Dkt. 32 at 8–9, for a warrantless seizure of an item to be justified, the "incriminating character" of the item (that it is either contraband or will assist in investigation or conviction) must be "immediately apparent." *Horton*, 496 U.S. at 136–37. That is not the case here. Both alleged crimes had already happened, and Mr. Ranney had been detained. There was no question of identity to be solved by seizing his gloves, nor any argument that the gloves would aid in his apprehension: he was surrounded by law enforcement and in handcuffs. Further, multiple officers were on-scene as witnesses to the alleged crimes; the idea that they believed the gloves would somehow aid in Mr. Ranney's conviction belies common sense. FPS Inspector Orchard was clear that he does not remember handling or taking any evidence or property (which is contradicted by video), and further told investigators in this case that he would have put any items logged as evidence into his report, and believes the lost or destroyed items are not evidence, "or he would have logged them as evidence." Jaffe Reply Decl., Ex. K at 6. Additionally, agents put the gloves in Mr. Ranney's backpack along with other items that were going to be returned to him, and only took them back out to seize at Hall's request. Together, what this demonstrates is that the nature of the gloves as evidence of any type was obviously not "immediately apparent" to the agents who (1) did not believe they were evidence; and (2) were on the verge of returning them to Mr. Ranney. The government has offered no declarations or evidence to meet their burden to prove otherwise.

**IV. The search of Mr. Ranney's backpack cannot be an inventory search, nor does inevitable discovery apply**

The government appears to partially concede that the inventory search exception does not apply here, and instead relies on the inevitable discovery doctrine (though with references to the inventory search exception). Govt Opp. at 8–9. Neither is applicable.

As noted in the initial motion, there was no inventory produced, the items were not saved as property or as evidence, and, because Mr. Ranney was never processed to be held in custody any longer than the time it took to complete writing his citations, there was no reason for an inventory to be made at all. Inventory searches are "reasonable under the Fourth Amendment only if they are

motivated by administrative purposes, and not solely by investigatory purposes." *United States v. Anderson*, 101 F.4th 586, 588 (9th Cir. 2024). "[F]ailure to comply with governing administrative procedures is relevant" in assessing motivation for conducting such a search. *Id.* Compliance, or non-compliance, with "department policy governing inventory searches is part of the totality of circumstances properly considered in determining whether a search satisfies the requirements of the inventory-search exception to the warrant requirement." *Id.*

Here, the purpose of this search was investigative, and the inventory search exception does not apply. As noted in the initial motion, Dkt. 39 at 7, n.4, ICE's property inventory and search procedures were not followed here. Further, nothing resembling an administrative search procedure was followed: when Mr. Ranney himself was searched, items were thrown away from his person seemingly at random. Dkt. 33-1, Jaffe Decl., Ex. A at 1:34–2:42. The backpack was searched, haphazardly, multiple times, in an open room, occasionally left unattended, with items being taken out and put back in without any kind of inventory being created. Dkt. 33-2, Jaffe Decl., Ex. B at 4:54–1:50:11. The government notes that where a routine booking procedure and inventory would have led to the discovery of evidence, the inevitable discovery doctrine applies. Govt Opp. at 8–9. But, again, no routine booking procedure nor inventory procedure was followed. As far as the defense is aware, Mr. Ranney was not fingerprinted, or booked into custody for longer then approximately two hours. Rather, he was searched and placed in a holding cell while his backpack was searched and citations were written. The search of his backpack did not comply with ICE regulations regarding booking or property. Dkt. 39, n.4. Accordingly, contrary to the government's assertion, this is not a case where officers failed to "strictly" comply with their own procedures, Govt. Opp. at 9; it is a case where they utterly failed to comply with **any** procedures and the government has not offered any sworn declarations or other evidence to prove that they would have done so. This falls far short of the proof of "demonstrated historical facts capable of ready verification or impeachment" that the government must establish to meet their burden as to inevitable discovery. *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1951).

Contrary to the government's position, officers did not need "to search his backpack for weapons to ensure the security of the area and confirm it did not contain contraband before returning

it to him." *Id.* That justification has nothing to do with an inventory search and is not a stand-alone exception to the Fourth Amendment's warrant requirement. And under those circumstances, the officers still could not seize items from his backpack without separate probable cause, which they lacked. Finally, as described *supra*, Sec. II, the search incident to arrest exception does not apply. Accordingly, the government's inevitable discovery argument fails under either form of analysis.

**V. The exclusionary rule applies here**

The exclusionary rule is a prudential doctrine created by the Supreme Court to "compel respect for the constitutional guaranty." *Elkins v. United States*, 364 U.S. 206, 217 (1960). The rule's purpose "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236 (2011). As noted *supra*, this is not a case where officers were acting in reliance on then-binding caselaw that has since been invalidated. *See, e.g.*, *Davis*, 564 U.S. at 240. The caselaw in these areas is well-established, and federal agents nonetheless failed to comply. *Cf. Camou*, 773 F.3d at 944–45 (declining to apply the good faith exception because [t]he governing law at the time of the search made clear that a search incident to arrest had to be contemporaneous with the arrest"). Exclusion is absolutely appropriate here. As Justice Sotomayor recognized in her concurrence in *Davis*, in direct contrast to the government's argument, the Supreme Court has "never refused to apply the exclusionary rule where its application would appreciably deter Fourth Amendment violations on the mere ground that the officer's conduct could be characterized as nonculpable." *Davis*, 564 U.S. at 251. "Whatever we have said about culpability, the ultimate questions have always been, one, whether exclusion would result in appreciable deterrence and, two whether the benefits of exclusion outweigh its costs." *Id.* at 252. Here, exclusion will result in deterrence from unconstitutional searches of individuals arrested as part of anti-ICE protests across the country.[2] Further, there are few

---

[2] As is evident in the facts of this case, as well as reporting from across the country, ICE absolutely needs to be deterred from Fourth Amendment violations. *See, e.g.*, DHS Warrantless Home Entry Memo's Fourth Amendment Problem, Brennan Center for Justice (Feb. 4, 2026) (available at https://www.brennancenter.org/our-work/analysis-opinion/dhs-warrantless-home-entry-memos-fourth-amendment-problem) (underlying ICE memo available at https://www.documentcloud.org/documents/26499371-dhs-ice-memo-1-21-26/). ICE's well-publicized actions as in response to protests protected by the First Amendment, including their actions in this case (spraying pepper balls into a crowd of peaceful protesters, excessive force towards Mr. Ranney and the other protester who was detained during their arrests, etc.), indicate that the exclusionary rule is appropriate here.

costs to the exclusion: the government has lost or destroyed the actual items at issue, and they cannot avail themselves of the good faith exception to excuse their own failings. *See Camou*, 773 F.3d at 945 ("The Supreme Court has never applied the good faith exception to excuse an officer who was negligent himself, and whose negligence directly led to the violation of the defendant's constitutional rights."). Under spoliation, even if not suppression, the government should not be allowed to use the photographs of them when the defense has had no access to the actual items, through actions of the government's own agents, who then lied about it.

## VI. Mr. Ranney is entitled to, at a minimum, an adverse inference based on the government's spoliation of evidence

In its opposition, the government cross-references their arguments made in response to Mr. Ranney's MIL #6 for its position on whether this Court should take an adverse inference when ruling on the instant motion to suppress. Accordingly, Mr. Ranney will reply to the assertions in the government's response to MIL #6.

### A. Mr. Ranney has shown that government agents acted in bad faith

The government's attempts to excuse and minimize agents' falsehoods about the search and seizure of Mr. Ranney's property, s*ee* Govt. Resp. to Def. MIL#6 at 5–6, fall flat.

The government first argues that Hall's statement that he "was not in possession of [Mr. Ranney's] property, nor do I remember seeing his property," Jaffe Decl., Ex. H at 178, is not a "knowingly false statement." Govt. Resp. to Def MIL#6 at 6. But video evidence shows Hall actively participating in the search and seizure, and accompanying Orchard through the building as they collectively transported the seized items to places unknown. Both Hall and Orchard are FPS personnel—FPS indisputably seized and took possession of Mr. Ranney's property. And the government has no answer to Agent Benavente's statement that he "spoke to all the FPS personnel that were at the ICE facility that day and they all stated that they did not search Ranney's property." Jaffe Decl., Ex. H at 496. This means that Hall affirmatively told Benavente that he did not search Mr. Ranney's property. Again, this is at odds with video footage that shows him standing over and discussing Mr. Ranney's property with other agents. Jaffe Decl., Ex. C at 01:38:51–01:46:03. Not only that, but according to Agent Caldwell, Hall specifically asked for the gloves to be seized. Jaffe

Decl., Ex. K at 2, 4. Hall was intimately involved with the search and seizure of Mr. Ranney's property, and decided to seize the gloves. It defies belief that a high-ranking federal agent like himself (Hall is a District Commander) would mistake or forget such significant events. He lied.

The government's position is that HSI ASAC Soper's statement that the HSI "agents didn't recall taking any property" and that an unidentified female agent told him "she thought [Ranney] took all his property with him" is also not "an intentional misrepresentation." Govt Resp. to Def MIL#6 at 6. There was only one female HSI agent (Sunaina Hajela) in the detention processing room. Clearly, ASAC Soper was referring to Hajela when he emailed that "she thought he took his property with him." *Id.* But she was not merely present with no direct involvement. To the contrary, she took photographs of the seized items as they were taken in and out of the brown paper bag, then leaned against a table close by to watch while Mr. Ranney's other property was put in his backpack and returned to him, Jaffe Decl., Ex. C at 01:45:30–01:52:18, and then spoke with and left the room with other agents (including Orchard) as Orchard was holding the paper bag, Jaffe Reply Decl., Ex. L at 00:37:00 – 00:40:29. Her statement that she "thought he took his property with him" is not believable in any way. It is false.

FPS Inspector Orchard is the most egregious liar. The government concedes, as they must, that video footage shows him carrying the paper bag with Mr. Ranney's seized property. Govt. Resp. to Defense MIL #6 at 6. But they have no credible explanation for his multiple statements that the surveillance conclusively disproves ("I did not search or inventory the subjects or their belongings"; "I do not know what happened with the items"; according to Benavente, Orchard "stated that he did not take RANNEY's property" and "said that he did not seize any of his property"). They offer only halfhearted speculation that it was not a lie, but "a simple mistake of memory."[3] Govt. Resp. to Def. MIL #6 at 6. To put it bluntly, that explanation is laughable. Orchard did not say he was not sure or that he had trouble remembering; to the contrary, he unequivocally stated multiple times that he did not take or search Mr. Ranney's property. That was not true. He lied.

---

[3] It would be odd for so many agents who were present and/or actively participated in the search and seizure over the course of two hours to all have collective amnesia about what happened. One has to wonder why so many agents involved in Mr. Ranney's case seem to have such substantial memory issues.

Perhaps the clearest way to illustrate the problem with the government's "explanation" of multiple agents' lying is with the following hypothetical: Imagine a defendant is on video sitting at a table next to a gun for two hours, periodically examining it or interacting with it, then finally picking it up and walking out the door with it. Four months later, that same defendant states, "I did not possess nor do I remember seeing the gun." Or "I did not take the gun." Or "I thought someone else took the gun." In that scenario, there is not a shred of doubt that the government would be singing a different tune. They would not chalk up those statements to a "mistake of memory." For good reason, the government would call them lies and present them as strong evidence of consciousness of guilt and wrongdoing. So too for the agents here.

The lies by government agents are not the only evidence of bad faith here. It is also the larger context of the agents' unorthodox actions throughout Mr. Ranney's arrest and detention that all demonstrate intentional disregard for Mr. Ranney's rights. These include, *inter alia*, using excessive force on Mr. Ranney during his arrest (including Caldwell using his forearm to press Mr. Ranney's throat into the ground); intentionally throwing things away that they find on his person for no apparent reason; engaging in illegal searches and seizures; mishandling his property every step of the way (no use of gloves, no documentation, no property receipt or other paperwork); and choosing not to properly document their search and seizure, despite the fact that there were easily over fifteen agents involved including multiple supervisors. *Cf. United States v. Zaragoza-Morerira*, 780 F.3d 971, 980 (9th Cir. 2015) (referring to agent's "glaring omissions" in her reports and affidavits, which "should be complete and accurate," as support of bad faith). These goes far beyond negligence or recklessness, and cannot be chalked up to coincidence. To that, the government offers no real answer.

**B. The lost/destroyed items were potentially exculpatory and no adequate substitute exists**

The government is wrong in its assertion that the lost/destroyed items were not potentially exculpatory and that adequate substitutes exist.

With respect to the paints and tools, Mr. Ranney argued in MIL #6 that "no photograph can stand in for the defense's and/or the jury's ability to examine the physical items themselves in order to discern whether anything showed signs of recent usage or whether they are consistent with what

the government asserts them to be." Def. MIL #6 at 13. The government has failed to respond, and thus conceded, that point. It is impossible to tell from the one photograph of the tools and paints whether any of these items were recently used or even whether they were in working order. To the extent the paints and tools have any probative value at all, the inability of the defense and the jury to examine the actual items indeed has prejudiced Mr. Ranney. If the government had not lost/destroyed the items, the defense and the jury could see whether the pliers/wirecutters even work and whether the paint cans are empty or have too much caked-on paint to be usable (as one appears to be, *see* Jaffe Decl., Ex. E at 200). Clearly, this would be exculpatory, but the government's unjustified loss/destruction of the items makes that impossible. *Cf. United States v. Sivilla*, 714 F.3d 1168, 1174 (9th Cir. 2013) ("In order for Sivilla to mount his only defense, that he did not know the drugs were in the car, the defense's in-house expert witness **would have needed access to the vehicle itself** . . . .") (emphasis added).

As for the gloves, the government's changing descriptions of the knuckles—morphing from one agent referring to them as "brass knuckles" in a report to the government's newer position that they are "hard-knuckle gloves," Govt. Resp. to Def. MIL #5 at 2—only serves to emphasize how critical it is for the defense, the jury, and the Court to examine the gloves themselves. Apparently, not even the government knows what material the gloves are. They concede that they do not appear metal in the photograph, Govt. Resp. to Def. MIL #6 at 7, which undermines their own agent's report describing them as brass knuckles with silver-colored glitter, *see* Def. MIL #6 at 8. But that does not solve the basic problem the government created by losing/destroying the gloves, which is that one cannot tell from the photograph what material the knuckles are made of. The government claims they are "hardened," but that cannot be discerned from the photograph. There is no way to tell whether the knuckles are made of hard or soft material (i.e., silicone, thick textile). The only way to tell would be to examine and feel the gloves themselves. As particularly relevant in the context of a motion to suppress, the government's loss/destruction of the gloves means that the Court—as the factfinder—has been deprived of physical evidence that would be highly germane to its resolution of the motion, particularly its determination of whether the gloves' nature as evidence was "immediately apparent."

Nor is it an adequate substitute for the government to suggest that the defense "could call a

knowledgeable Moto Sports employee to opine on the brand's glove products and the material of the gloves shown in the picture[.]" Govt. Resp. to Def. MIL #6 at 8. That is impermissible burden-shifting. It is simply another formulation of, "The defendant could just testify about it," a proposition that the Ninth Circuit expressly rejected in *Zaragoza-Morerira*. 780 F.3d at 981–82. The "solution" for the government's violation of Mr. Ranney's rights in losing/destroying the gloves cannot be to violate **more** of his constitutional rights by forcing him to call a witness or testify.

It appears that government witnesses who "interacted with that property" will testify that they were "hardened" or "hard-knuckle."[4] Govt. Resp. to Def. MIL #6 at 7. They should not be permitted to do so. Without the gloves themselves, the defense cannot properly refute such testimony through no fault of their own and due to the government's wrongdoing. Cross-examination is insufficient to mitigate such prejudice, as the jury would naturally believe that law enforcement agents who handled the gloves must be right in the absence of the gloves themselves. That would be the very definition of rewarding the government's wrongdoing by giving them an unfair advantage. The government should not be able to introduce evidence of the gloves beyond the very basic information that Mr. Ranney was wearing gloves.

**C. The sanctions Mr. Ranney requests are appropriate**

As Mr. Ranney has explained in his MIL #6, dismissal of the Information is warranted in this matter when one considers the laundry list of flagrant misconduct committed by the agents involved in this case. *See supra* Part III.A.

Even if the Court does not agree that dismissal is warranted, it should impose lesser spoliation sanctions, including an adverse inference in relation to the instant motion. The government's analysis of the *Loud Hawk* test is wrong. Mr. Ranney disagrees that the items were lost/destroyed through mere negligence; the mosaic of brazen misconduct by numerous agents shows intentional disregard for Mr. Ranney's rights and interests, not the least of which was lying about what had happened—a classic sign of consciousness of guilt. The fact that agents are on camera intentionally throwing out other things they find while searching Mr. Ranney shows that they had no problem with discarding

[4] These are the same agents who supposedly could not remember the search and seizure of Mr. Ranney's property (including the gloves that they will apparently testify in detail about).

his property. The choice not to properly document anything, despite high-ranking agents' personal involvement, speaks volumes about the agents' intent to hide their actions from scrutiny.

Mr. Ranney has clearly laid out the prejudice that he suffers, which includes the inadequacy of substitute evidence, the nature and kinds of proof that are now lost to him, and the probable effect on the jury from not having such evidence. In particular, the latter factor weighs heavily in Mr. Ranney's favor. That factor includes "dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence." *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (Kennedy, J., concurring). It is best encapsulated here by the scenario described *supra* Part III.B., wherein government witnesses are allowed to testify that the knuckles are "hard" or "hardened," and the government will likely argue that this means Mr. Ranney must have intended to cause significant injury to agents and significant damage to property, and the defense will be unable to counter by showing the jury the gloves to demonstrate their harmlessness.

Accordingly, this Court should take an adverse inference against the government when ruling on Mr. Ranney's suppression motion.[5]

**CONCLUSION**

For the foregoing reasons, Mr. Ranney respectfully requests that the Court hold an evidentiary hearing on all contested issues of fact and suppress all fruits of the warrantless search of his person and backpack and seizure of his property.

July 5, 2026
Dated

JODI LINKER
Federal Public Defender
Northern District of California

/S

ANGELA CHUANG
SAMANTHA JAFFE
Assistant Federal Public Defenders

[5] This could take the form of, for example, inferring that the gloves were unfavorable to the government (i.e., soft material and/or not immediately apparent incriminating nature).