CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

E. WISTAR WILSON (CABN 324705)
ELI J. COHEN (NYBN 5539226)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
FAX: (415) 436-7234
Wistar.Wilson@usdoj.gov
Eli.Cohen@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CALEB ALEXANDER RANNEY,<br><br>Defendant. | Case No. 25-CR-00416-TSH<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER BRADY V. MARYLAND**<br><br>Hon. Thomas S. Hixson |

## CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND ........................................................................................................................1

A. Factual and Procedural Background ......................................................................1

B. The Government's *Henthorn* Request Protocol.........................................................2

C. Meetings With Inspector Glumaz and *Henthorn* Responses ..........................................3

ARGUMENT ...........................................................................................................................6

A. Ranney Fails to Establish a *Brady* Violation ..............................................................6

B. The Requested Remedy is Inappropriate ................................................................13

CONCLUSION........................................................................................................................16

# TABLE OF AUTHORITIES

## CASES

*Bailey v. Rae*, 339 F.3d 1107 (9th Cir. 2003) .......... 10

*Brady v. Maryland*, 373 U.S. 83 (1963) .......... 2, 6

*Giglio v. United States*, 405 U.S. 150 (1972) .......... 2

*Kyles v. Whitely*, 514 U.S. 419, 434 (1995) .......... 11

*Malone v. Felker*, 453 Fed.Appx. 754 (9th Cir. 2011) .......... 9

*Milke v. Ryan*, 711 F.3d 998 (9th Cir. 2013) .......... 6

*United States v. Agurs*, 427 U.S. 97 (1976) .......... 11

*United States v. Bagley*, 473 U.S. 667 (1985) .......... 6, 10, 11

*United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020) .......... 13

*United States v. Cloud* .......... 11

*United States v. Davenport*, 753 F.2d 1460 (9th Cir. 1985); .......... 7

*United States v. Felix*, No. CR 13-633 PJH, 2014 WL 5872824, (N.D. Cal. Nov. 12, 2014) .......... 9

*United States v. Garcia*, No. 18-CR-00466-BLF, 2022 WL 1801496, (N.D. Cal. June 2, 2022), *aff'd*, No. 22-10291, 2025 WL 314126 (9th Cir. Jan. 28, 2025) .......... 14

*United States v. Garcia-Martinez*, 730 F. App'x 665 (10th Cir. 2018) .......... 9

*United States v. Garrison*, 888 F.3d 1057 (9th Cir. 2018) .......... 13, 14

*United States v. Gordon*, 844 F.2d 1397 (9th Cir. 1988) .......... 7

*United States v. Green,* 962 F.2d 938 (9th Cir.1992) .......... 13

*United States v. Hastings*, 461 U.S. 499 (1983) .......... 13

*United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991) .......... 2

*United States v. Kearns*, 5 F.3d 1251 (9th Cir. 1993) .......... 13, 15

*United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011) .......... 6

*United States v. Morrison*, 449 U.S. 361 (1981) .......... 13

*United States v. Nagra*, 147 F.3d 875 (9th Cir. 1998) .......... 7

*United States v. Olsen*, 704 F.3d 1172 (9th Cir. 2013) .......... 6, 12

*United States v. Paladin*, 748 F.3d 438 (1st Cir. 2014) .......... 11

*United States v. Price*, 566 F.3d 900 (9th Cir. 2009) ........ 12

*United States v. Reid*, 553 F.Supp.3d 882 (W.D. Wash. 2021) ........ 15

*United States v. Snell*, 676 Fed. App'x 144 (4th Cir. 2017) ........ 9

*United States v. Souffront*, 338 F.3d 809 (7th Cir. 2003) ........ 9

*United States v. Taylor*, 802 F.2d 1108 (9th Cir. 1986) ........ 15

*United States v. Terragna*, 390 F. App'x 631 (9th Cir. 2010) ........ 7

**STATUTES**

18 U.S.C. § 111(a)(1) ........ 1

18 U.S.C. § 1361 ........ 1

## INTRODUCTION

This Court should deny Defendant Caleb Alexander Ranney's motion to dismiss the Information or to provide a negative inference jury instruction. First, Ranney fails to demonstrate that the government violated its *Brady* obligations based on its recent disclosure pertaining to Federal Protective Service Inspector Stephen Glumaz's FN 303 decertification. To show a *Brady* violation, the defense must demonstrate that the evidence at issue is (1) favorable to the defense, (2) suppressed by the government, and (3) material. Here, there was no suppression under *Brady* because the government disclosed the information to the defense prior to trial and within 48 hours of receipt in accordance with the Court's pretrial scheduling order, and in any event, the evidence was neither favorable nor material.

Second, the defense's requested remedies—of dismissal or an adverse jury instruction—are wholly inappropriate and unwarranted here. Remedies must be tailored to the prejudice suffered. Here, the only prejudice that the defense claims to have suffered from the allegedly late pretrial disclosure of evidence is a disruption to its trial preparation schedule and "ability to fully investigate the claim," Dkt. 94 at 13-14[1], which is fully cured by a continuance at most.

## BACKGROUND

### A. Factual and Procedural Background

On December 5, 2025, the defendant was charged by Information with one count of Assault on a Federal Officer, in violation of 18 U.S.C. § 111(a)(1), and one count of Destruction of Government Property, in violation of 18 U.S.C. § 1361, in connection with an August 8, 2025 incident in San Francisco. Dkt. 1. On March 12, 2026, the case was set for trial on July 27, 2026. Dkt. 15. The Court entered an order setting pretrial deadlines on May 20, 2026. Dkt. 21. The Order prescribed a June 10, 2026 for Rule 16 discovery and the "[d]isclosure of *Brady/Giglio/Jencks* material in possession, custody, or control of government[,]" providing that "[a]ny additional material obtained after this deadline must be turned over within 48 hours." Dkt. 21 at 2.

Months in advance of trial, counsel for the government initiated the standard process for gathering *Henthorn* material for law enforcement witnesses it might potentially call at trial. *See, e.g.*,

[1] The government references the file-stamp page numbers that appear at the top of the document.

Declaration of Eli J. Cohen ("Cohen Decl.") at ¶¶ 2-4. As part of that process, on May 15 and 19, 2026, the government sent *Henthorn* requests via email to the U.S. Department of Homeland Security Office of the Inspector General ("DHS-OIG") for information about various employees, including Federal Protective Service ("FPS") Inspector Stephen Glumaz, noting the government's disclosure deadline of June 10, 2026. *Id.* at ¶ 2-3. On May 19, 2026, the government also sent a *Henthorn* request to FPS's Office of the General Counsel ("FPS OGC") requesting a search of the personnel files of various employees, including Inspector Glumaz. *Id.* at ¶ 4.

### B. The Government's *Henthorn* Request Protocol

As a matter of general practice and consistent with *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991), when preparing for a proceeding at which it will be calling law enforcement witnesses, the government transmits requests for a review for *Giglio* material to the body or bodies that maintain personnel records for each witness. In the case of federal law enforcement agencies, this generally includes the agency itself, as well as the Office of the Inspector General for that agency or parent agency, as the two can possess different universes of information. For FPS, the government transmits such requests to both FPS OGC, as well as DHS-OIG.

These requests are generally made weeks or months in advance of the date of anticipated testimony. The relevant agency reviews its files and provides a response, but the U.S. Attorney's Office does not typically receive full personnel files, which can contain voluminous records related to salary, leave, health benefits, and other similar matters. Once in possession of relevant materials, the government conducts an analysis of whether materials are subject to disclosure under its various discovery obligations, such as *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). A potential alternative—simply giving the defense personnel files for all law enforcement witnesses so they may peruse them for potential *Brady* or *Giglio* information—is untenable and would result in substantial intrusions on individuals' privacy.

In addition to this, the government goes through a *Henthorn* questionnaire with law enforcement witnesses, in which it asks a series of probing questions designed to elicit potential exculpatory and impeachment information that may be subject to disclosure which may not be captured by its formal record check requests. It then evaluates these responses to determine whether any responses constitute

disclosable information. This process can require follow-up investigation, including efforts to obtain underlying documentation.

### C. Meetings With Inspector Glumaz and *Henthorn* Responses

On May 20, 2026, undersigned counsel for the government and FPS Senior Special Agent ("SSA") Timothy Rivero ("Agent Rivero") interviewed Inspector Glumaz at the U.S. Attorney's Office in San Francisco, California. *See* Declaration of SSA Timothy Rivero ("Rivero Decl.") at ¶ 3; Cohen Decl. at ¶ 5. The subject matter of the meeting was Inspector Glumaz's involvement in the August 8, 2025 incident underlying the charges in this case. Rivero Decl. at ¶ 3; Cohen Decl. at ¶ 5. During the interview, Inspector Glumaz discussed his use of an FN 303 Less Lethal Launcher that day, including that he was decertified from using the FN 303 on a subsequent date. Rivero Decl. at ¶ 3; Cohen Decl. at ¶ 5. Inspector Glumaz's statements during that meeting led involved parties to believe that the decertification was due to his use of the FN 303 during the August 8, 2025, incident, and specifically due to his deployment of FN 303 rounds into the ground rather than directly at a person during that incident. Rivero Decl. at ¶ 3; Cohen Decl. at ¶ 5. During that meeting, government counsel also asked Inspector Glumaz the standard questions in its *Henthorn* questionnaire. Cohen Decl. at ¶ 5.

On June 1, 2026, the government received an email response from DHS-OIG, indicating four closed complaints against Inspector Glumaz but failing to explain the basis for the complaints or any findings made. Cohen Decl. at ¶ 8. On June 5, 2026, the government received a letter response from FPS OGC pertaining to all employees whose personnel files the government had requested it review. *Id.* at ¶ 10. The response indicated that Inspector Glumaz's file contained no responsive information. *Id.*, Exhibit G (under seal) (June 5, 2026 FPS OGC Response Letter).

On June 10, 2026, the government produced to the defense Inspector Glumaz's Use of Force Report pertaining to the events of August 8, 2025 that discussed his use of an FN 303 device. Cohen Decl. ¶ 11. The government also produced correspondence from August 2025 between Inspector Glumaz and other FPS personnel regarding his use of force on August 8, 2025. *Id.* Specifically, on August 18, 2025, FPS Inspector and Senior Firearms Instructor Jonathan DeSilva appears to respond to Inspector Glumaz's representation that he "deployed 7 projectiles of [pepper spray] at approximately 4-feet towards the front of the protesters for area denial / area saturation" with the instruction that "Per

FPS Policy, the FN 303 is a direct impact system, it's not for area deniability." Cohen Decl., Exhibit H (Email Chain).

Both parties filed witness lists on June 24, 2026, consistent with the Scheduling Order for pretrial deadlines. *See* Dkts. 21 (Pretrial Scheduling Order); 28 (Defense Witness List); 36 (Gov't Witness List). Neither party listed Inspector Glumaz as a potential witness at trial.

Also on June 24, both parties filed motions *in limine*, consistent with the Court's scheduling order. Dkts. 37 (Gov't MIL); 39 (Defense MIL Corrected Docket). In its motion *in limine* no. 7, the government moved to preclude the defense from raising a self-defense claim based on alleged excessive force by law enforcement, arguing that such a claim was unavailable as a matter of law because there is no evidence that the defendant was under threat of immediate use of excessive force at the time he assaulted an ICE officer on August 8, 2025. Dkt. 37 at 13-16. As described in other government filings, once the defendant last kicked the sally port garage door (which is when the FN 303 was deployed), he ran across the street, about twenty seconds passed, and then he charged across the street at the ICE officer and shoved him. *See* Dkt. 78 at 11.

On July 1, 2026, the defense filed its response to the government's motions *in limine*, opposing the government's motion *in limine* no. 7 in part and asking the Court to defer ruling on the availability of a possible self-defense claim. Dkt. 41 at 11-15.

Following the May 20, 2026, interview of Inspector Glumaz, SSA Rivero prepared an interview summary, which he provided to government counsel on July 1, 2026. Cohen Decl. at ¶ 13. Counsel disclosed that summary to the defense that same day. *Id.*; *see also* Dkt. 95 at ¶ 4. The notes stated in relevant part, "Wit[ness] attempted to fire the 303 rounds at the thigh area of the protester damaging the federal facility," and, "Wit[ness] advised that he was subsequently decertified as an FN-303 user. (sic.) Which he later intends to recertify at a later date." *See* Cohen Decl., Exhibit I (Interview Summary).

At the July 9, 2026 pretrial conference, the government requested that it be provided 48 hours' notice of the defense's intended witnesses, so that it may prepare to cross-examine them. The Court denied the request, and instead ordered that the defense was to provide a witness list, if any, at the close of the government's case-in-chief. That same day, the defense served a subpoena on Inspector Glumaz for his testimony at trial. Dkt. 95 at ¶ 5. The government did not learn of this subpoena until July 14,

when Agent Rivero provided notice to government counsel by phone call. Cohen Decl. at ¶ 14. On July 16, 2026, the defense sent government counsel an email stating that "You're also likely aware that we've subpoenaed Hall, Glumaz, and Hajela as potential witnesses." *Id.*, Exhibit J (July 16, 2026 email).

Having learned of Inspector Glumaz's status as a contemplated defense witness, government counsel, along with Agent Rivero, conducted a witness preparation session on July 21, 2026. Cohen Decl. at ¶ 16. During this meeting, Inspector Glumaz stated that his FN 303 decertification was in fact due to two incidents: the one relating to the instant matter and one that had occurred later, though he was not certain of when the second incident had occurred. *Id.* He further stated that he had been informed of the decertification by email sometime in 2026, although he was not sure of when. *Id.* Government counsel was previously unaware of the second incident involving Inspector Glumaz's use of the FN 303. *Id.* Agent Rivero obtained and provided a copy of the email notifying Inspector Glumaz of his decertification on July 22, 2026, and provided a summary of the meeting on that same date. *Id.* at ¶ 17. The government produced those documents the same day. *Id.* The email noted that the decertification was "in connection with" the use of force incident on August 8, 2025, and another on August 20, 2025, Cohen Decl., Exhibit J (Decertification Email), as opposed to "subsequent[]" to the August 8, 2025, incident. *See* Cohen Decl., Ex. H.

On July 23, 2026, the parties appeared before the Court for a hearing. The defense made an oral motion to dismiss the case for an alleged *Brady* violation. In its filed motion to dismiss, the defense argues that the failure to disclose that Inspector Glumaz's decertification was, in part, tied to his use of the FN 303 during the August 8, 2025 incident is a *Brady* violation because it "supports [the defendant's] excessive force claim against Glumaz, which, in turn, supports a self-defense claim as well as an argument that the officers involved were not engaged in good-faith performance of their official duties." *See* Dkt. 94 at 11-12.

During the July 23, 2026, hearing, the defense also made a series of discovery demands, which the Court ordered the defense to transmit to the government. The Court ordered the government to obtain and retain discovery responsive to the defense's demands, and should it not be able to obtain complete responsive discovery by July 26, 2026, to file a declaration stating its efforts and progress. On

July 23, 2026, the defense sent a list of discovery demands. The government made various requests to various bodies of agency counsel and to Agent Rivero on July 23, 2026, and engaged in ongoing discussions with agency counsel throughout all of July 24, 2026 in an effort to comply with the Court's order. *See generally*, Cohen Decl. at ¶¶ 19-29. As of the time of this writing, the government has obtained certain discovery, but a significant amount is still outstanding. *Id.* at ¶ 30.

Importantly, however, the government received in response to its requests an email chain from March 2026 summarizing an FPS Use of Force Committee's review of Inspector Glumaz's use of the FN 303 during both the August 8, 2025 and August 20, 2025 incidents. Cohen Decl. at Exhibit Q (under seal) (Email Chain). Although it communicated the decision to de-certify Inspector Glumaz as an FN 303 operator, it stated with respect to the August 8, 2025 incident that the committee "was able to determine that the use of force was within policy and training doctrine," but that the narrative provided was inadequate. *Id.* In other words, decertification was appropriate, but Inspector Glumaz's use of force on August 8, 2025 was policy-compliant.

## ARGUMENT

The Court should deny the defense's motion to dismiss because (1) Ranney fails to demonstrate any *Brady* violation, and (2) the appropriate remedy, if any, would be a continuance, and certainly not dismissal.

### A. Ranney Fails to Establish a *Brady* Violation

*Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 88; *see also United States v. Bagley*, 473 U.S. 667, 674-75 (1985). Evidence is favorable pursuant to Brady "either because it is exculpatory or impeaching." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013). To establish a Brady violation, the defendant must show that: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued," meaning that the information was material to guilt or punishment. *United States v. Olsen*, 704 F.3d 1172, 1181 (9th Cir. 2013) (internal quotations omitted); *see United States v. Kohring*, 637 F.3d 895, 902 n.1 (9th Cir. 2011) (For

purposes of a *Brady/Giglio* violation, "material and prejudicial have the same meaning.") (internal quotation marks omitted).

Ranney's *Brady* claim fails on all three prongs. First, the information regarding Inspector Glumaz's decertification was not suppressed under *Brady* because it was disclosed immediately upon receipt by the government and in full compliance with the Court's pretrial order. Second, Ranney fails to demonstrate that the evidence was favorable to the defense, either as proper impeachment evidence toward any government witness or exculpatory toward the issue of guilt or innocence at trial. Finally, Ranney cannot demonstrate the evidence was material under *Brady*, particularly in light of the entire record thus far, including the evidence the defense had already received.

**1. The Evidence Was Not Suppressed**

Generally, [u]nder *Brady*, the government must disclose *before trial*," *United States v. Nagra*, 147 F.3d 875, 881 (9th Cir. 1998), and "[d]isclosure, to escape the *Brady* sanction, must be made at a time when the disclosure would be of value to the accused." *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985); *accord United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988), including before trial begins, *United States v. Terragna*, 390 F. App'x 631, 638 (9th Cir. 2010). Here, trial has not yet occurred and the government promptly provided disclosure of the discovery at issue upon receipt. Even if the disclosures were made close to the eve of trial, they were nonetheless made before the start of trial, and most importantly, at a time when the evidence could and can still be investigated and used by the defense at trial.

To be clear, however, the disclosures at issue here, even if seemingly belated, were made reasonably promptly upon receipt of the information by the government and in compliance with the Court's pretrial schedule order. According to that order, discovery was due on June 10, 2026, with any discovery obtained thereafter due for disclosure within 48 hours. Dkt. 21. The government provided all discovery in its possession by the June 10, 2026 deadline, and has made continual productions throughout the pendency of the case. On July 1, 2026, the prosecution obtained Special Agent Rivero's notes regarding the May 20, 2026, interview of Glumaz, which were then promptly disclosed to the defense that very same day. *See* Cohen Decl. at ¶ 13; *see also* Ex. E to A. Chuang Decl., Dkt. 95-5. This comported with the Court's 48-hour disclosure requirement of any discovery obtained after the

June 10 deadline. Same too with the government's subsequent disclosures—all have been provided almost immediately upon receipt, and well within the 48-hour deadline. The defense motion concedes that the "basic information of [Glumaz's] decertification was known to the defense" from this production. Dkt. 94, p. 3. Thus, as of July 1, 2026, defense was fully aware that Glumaz "advised that he was subsequently decertified as an FN-303 user" after the August 8, 2025 event. Because the information was disclosed three and a half weeks before trial, at a time when it "would be of value to the accused," the defense had sufficient time to investigate the decertification in preparation for trial. In fact, as the record indicates, the defense did have adequate time to make use of this information in its trial preparation when it subsequently subpoenaed Inspector Glumaz to testify at trial (and had not previously listed Inspector Glumaz on its defense witness filed on June 24, 2026).

Indeed, Ranney does not expressly argue that this disclosure on July 1, 2026, prevented his ability to investigate the decertification information. Rather, he only argues the information contained in the email disclosed on July 22, 2026, the same day the prosecution received it, "ensured that the defense lacks the ability to fully investigate the claim, as it would have if the evidence had been timely disclosed to them." Dkt. 94 at 13. However, this disclosure, even if made close to the eve of trial, still occurred four days prior to trial and at a time when it still "would be of value to the accused." Furthermore, the only "new" information from the email disclosed on July 22, 2026, in Ranney's own terms, is that the "basis" for Inspector Glumaz's decertification were the incidents "on August 8, 2025 (the protest at issue here) and on August 20, 2025" (an incident of which defense claims it was not previously aware). As further explained below, this additional information is not material under *Brady* because it does not substantially alter the information the defendant concedes he already knew, which he argues supports his self-defense theory—that Inspector Glumaz was decertified from using the FN 303 subsequent to the events at issue on August 8, 2025.

To extent that defense suggests that the government failed in its "duty to learn of any favorable evidence known to others acting on the government's behalf," the record shows that the duty was satisfied here. The government reasonably sought any *Giglio*/*Henthorn* information from the various agencies involved well in advance of trial, pursuant to its normal protocol, and with the Court's pretrial deadlines expressly in mind. Prior to July 1, 2026, the government was also entirely unaware that

defense would be seeking to assert a self-defense theory at trial, given both the lack of notice from defense of any affirmative defense and the lack of evidentiary support for any such defense. While the government has a duty to learn of any favorable evidence, it does not have a duty to speculate as to any possible defense that the defendant might assert at trial.

In any event, because the information was provided in sufficient time for the defendant to determine he should subpoena Inspector Glumaz (whom the defendant knew was not a government witness), Ranney fails to show it was suppressed under *Brady*.

**2. The Evidence is Not Favorable to the Defendant**

Ranney fails to show that the Glumaz evidence is favorable to the defense as either impeaching or exculpatory evidence.

First, the information does not constitute impeachment evidence under *Brady/Giglio* because Inspector Glumaz is not a government witness, nor relevant to the government's case or proof of the crimes charged. Inspector Glumaz stands to provide no relevant evidence that cannot be easily adduced through another witness or video footage. Surveillance video shows Ranney damaging the sally port door before running across the street. Any testimony Inspector Glumaz could provide about what was observable inside the sally port while Ranney was damaging the door can come from various other witnesses also inside the sally port at the same time. Further, video shows Ranney running back across the street and assaulting Officer Love. Glumaz was not present when this happened. He can add nothing to proof of the assault. Instead, Inspector Glumaz has been noticed solely as a defense witness. For *Brady* purposes, many courts have recognized that there is no requirement for the government to disclose to the defense material that would allow the defendant to impeach his own witness. *See Malone v. Felker*, 453 Fed.Appx. 754, 754 (9th Cir. 2011) ("No Supreme Court precedent clearly establishes that possible impeachment evidence of a defense witness is favorable to the accused, thereby mandating disclosure under *Brady*."); *United States v. Snell*, 676 Fed. App'x 144, 150 (4th Cir. 2017) ("The government had no obligation under Brady or otherwise to anticipate who the defense might call as a witness and disclose evidence that was only relevant to the government's potential impeachment of a defense witness."); *United States v. Souffront*, 338 F.3d 809, 824 (7th Cir. 2003) (no *Brady* violation for failure to disclose ATF agent had been accused of covering up theft by another cop when agent was

called by defense to impeach a government witness and to testify to defendant's state of mind, holding that "[i]mpeaching the testimony of their own witness is not favorable to the defense"); *United States v. Garcia-Martinez*, 730 F. App'x 665, 678 (10th Cir. 2018) (collecting cases); *see also United States v. Felix*, No. CR 13-633 PJH, 2014 WL 5872824, at *4 (N.D. Cal. Nov. 12, 2014), *aff'd*, 663 F. App'x 557 (9th Cir. 2016) ("Although the Ninth Circuit has not ruled on the issue whether Giglio obligations extend to witnesses whom the government does not call at trial, several circuit courts have held that the Giglio obligation to disclose impeachment materials does not extend to defense witnesses, apart from the Brady obligation to disclose exculpatory evidence."). Thus, to the extent the information regarding Glumaz's decertification may be impeaching in nature, it is not subject to the government's *Brady*/*Giglio* obligations because he is neither a government witness nor part of the investigative team. Indeed, the defense appears to implicitly concede this point based on its arguments regarding the relevance and admissibility of Glumaz's testimony—as supportive only of its self-defense claim, rather than impeachment evidence.

Second, Ranney's argument that the decertification evidence is exculpatory because it supports his self-defense theory also falls short. "To say that evidence is 'exculpatory' does not mean that it benefits the defense in every regard or that the evidence will result in the defendant's acquittal." *Bailey v. Rae*, 339 F.3d 1107, 1115 (9th Cir. 2003). Rather, "exculpatory" connotes a broader category of evidence that, "if disclosed and used effectively, [ ] may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676. This is simply not the case here with the evidence in question. The defense fails to sufficiently explain how the information recently disclosed—that Glumaz was decertified in relation to the August 8 and 20 incidents—might make any difference between conviction and acquittal. According to Ranney:

> [T]he evidence is that Inspector Glumaz, who fired pepper balls into the protesters (including Mr. Ranney) moments before Mr. Ranney's alleged assault, was disciplined for that action and his pepper ball certification was taken away. This supports an excessive force claim against Glumaz, which, in turn, supports a self-defense claim as well as an argument that the officers involved were not engaged in good-faith performance of their official duties.

Dkt. 94 at 12.

On its face, Ranney's explanation for the relevance of the decertification information to his self-defense theory is based on a series of assumptions and improper inferences that are actually not accurate nor supported by the evidence, and would likely be barred under certain Federal Rules of Evidence. For example, Ranney's theory is based on the incorrect assumption that Inspector Glumaz was disciplined based on an excessive use of force, and not some other reason. But in fact, as noted above, it appears that an FPS Use of Force Committee determined that Inspector Glumaz's use of force on August 8, 2025 was consistent with policy. The decertification does not have the significance the defense presumed it would. Furthermore, Ranney fails to explain how or why Glumaz's individual use of force should be imputed to all other agents during the events on August 8, or how it otherwise provides justification for Ranney's subsequent assault of a different law enforcement officer.

In the context of an alleged *Brady* violation, the initial inquiry is whether the evidence at issue is favorable to the defendant. It is not. While Ranney identifies his self-defense theory as the only potential use of the alleged evidence, he ultimately fails to establish the logical link between the evidence and his defense theory. And to the extent this Court finds that the evidence is favorable because it could provide some support to Ranney's self-defense theory, it certainly does not meet the materiality standard, as discussed below.

**3. The Evidence is Not Material**

Evidence is material under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Despite the use of the term "reasonable probability," the Supreme Court has emphasized that materiality does not require a demonstration by a preponderance. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–10 (1976). In deciding whether this reasonable probability exists, courts should consider the suppressed evidence collectively, rather than on an item-by-item basis. *Kyles*, 514 U.S. at 436. Additionally, "[T]he burden

to demonstrate the materiality of undisclosed evidence rests squarely" with the defense. *United States v. Paladin*, 748 F.3d 438, 445 (1st Cir. 2014).

Generally, *Brady* violations are raised and adjudicated post-trial, upon the revelation by the government or discovery by the defense of information favorable to the accused that should have been disclosed before trial. However, as the Ninth Circuit noted in *United States v. Cloud*, the traditional *Brady* materiality standard does not fit well in cases "where the suppression is discovered during trial and before a 'look back' is possible." 102 F.4th 968, 979 (9th Cir. 2024). As a "baseline for evaluating *Brady* violations discovered before conviction," the "proper test for pretrial disclosure of exculpatory evidence should be an evaluation of whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses." *Id*. (quoting *United States v. Price*, 566 F.3d 900, 907 n.6 (9th Cir. 2009)). Thus, in the pretrial or mid-trial disclosure context, "the materiality inquiry should evaluate the relative value of the withheld evidence 'on the basis of the indictment, the pretrial proceedings, the opening statements, and the evidence introduced up to that point.'" *Id*. (quoting *United States v. Olsen*). Furthermore, "the materiality analysis could consider whether, had the evidence been timely disclosed, it might have altered the prosecution or defense strategy." *Id*.

Under the *Cloud* materiality standard, Ranney's *Brady* claim definitively fails. Here, the recently-disclosed Glumaz information is not materially different from the evidence previously disclosed to defense and holds minimal relative value when viewed in the context of the charges, the pretrial proceedings, and the evidence and information already known to the defense. First, to the extent that Glumaz could be supportive of Ranney's self-defense claim, this defense pertains only to one of the two charges he is facing at trial. The information pertaining to Inspector Glumaz's decertification is wholly irrelevant to the second count of destruction of government property. Second, the information recently disclosed is not materially different from what was already known to the defense, and thus adds little to no value to the defense's case. Third, the defense also fails to demonstrate materiality of this evidence by showing its admissibility at trial. As previously noted, Glumaz has never been noticed as a witness for the government, and is therefore not relevant or admissible as impeachment evidence of a government witness. The defense also cannot introduce the evidence purely to impeach the

government's investigation or otherwise shed negative light on the government in general in support of an improper nullification argument. Indeed, there is no showing by Ranney how the newly disclosed information pertaining to Inspector Glumaz's decertification might have affected or altered its defense strategy such that it is prejudiced with regard to its ability to present a defense a trial. In fact, the only prejudice identified by Ranney is the impact on his ability to investigate the information and the purported diversion of time and resources from its trial preparation due to the late disclosures. Such prejudice, however, does not warrant the extraordinary and unfair remedy of dismissal, but is, at most, fully remedied by a continuance, as discussed below.

**B. The Requested Remedy is Inappropriate**

"[S]imply showing a *Brady* violation—withholding of evidence that caused prejudice—is not a sufficient basis to dismiss an indictment. Only where the government withheld *Brady* material through 'flagrant misconduct,' causing 'substantial prejudice' to the accused, will justify the court's exercise of its supervisory powers to dismiss the case with prejudice." *United States v. Bundy*, 968 F.3d 1019, 1031 (9th Cir. 2020) (citations omitted). Here, the government has not violated *Brady*, but even if it had, dismissal of the information would be an improper remedy because the government's July 22, 2026, disclosure is not "flagrant misbehavior" and has not resulted in substantial prejudice to the defendant. Rather, the appropriate remedy, if any, would be a continuance of the trial date sufficient to allow the defendant to assess the newly disclosed information.

"[R]emedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981); *United States v. Garrison*, 888 F.3d 1057, 1065 (9th Cir. 2018). Rather, a district court must decide the appropriate remedy "with some caution and a with a view toward balancing the interests involved[.]" *United States v. Hastings*, 461 U.S. 499, 506-07 (1983). It follows that dismissal of an indictment (or information) "is an appropriate sanction for a constitutional violation only where less drastic alternatives are not available." *United States v. Kearns*, 5 F.3d 1251, 1254 (9th Cir. 1993).

Dismissal is only appropriate if (1) the government has engaged in "flagrant misbehavior" *and* (2) the defendant has suffered substantial prejudice as a result. *Id*. at 1253. "Flagrant misbehavior" is conduct "so grossly shocking and outrageous as to violate the universal sense of justice." *United States*

*v. Green,* 962 F.2d 938, 941 (9th Cir.1992). Conduct does not meet this standard where the government notifies a defendant promptly upon learning of new information. *United States v. Wills*, 88 F.3d 704, 712 (9th Cir. 1996). Moreover, an "accidental or merely negligent" failure to disclose cannot be flagrant misconduct. *United States v. Bundy*, 968 F.3d 1019, 1038 (9th Cir. 2020).

Here, as discussed above, the defendant has known of Inspector Glumaz's use of the 303 launcher since the earliest days of the case and has known that he was decertified on the use of the device "subsequent to" the August 8, 2025, incident since July 1, 2026. On July 22, 2026, Inspector Glumaz told the government that he was decertified not only "subsequent to" but "because of" the August 8 incident, and the August 20 incident about which the government had not previously known. The government received written confirmation of this information on July 23, 2026, and disclosed it to the defense the same day. The notion that this is government conduct "so grossly shocking and outrageous as to violate the universal sense of justice" is, at best, hyperbolic.

The defendant's attempts to articulate the prejudice he has suffered are even thinner. He asserts that he now "lacks the ability to fully investigate the claim" or other protests at the same location. Dkt. 94 at 13.[2] This is a conclusory claim of prejudice that would apply equally to any late discovered fact. By definition, there is less time to investigate late-disclosed information than earlier-disclosed information. If that alone established not only prejudice but "substantial prejudice," the second requirement would be met in every case.

In any case, as discussed above, the government has now done the investigation to which the defendant refers, and it has revealed that Inspector Glumaz was decertified from use of the 303 device, in essence, for being a bad report writer and not for excessive use of force. The decertification has nothing to do with the defendant's self-defense claim, and he has therefore suffered no prejudice. Because the defendant has fallen woefully short on both prongs of the *Kearns* analysis, dismissal is not available as a remedy.

Nor should the Court give an adverse jury instruction. *United States v. Garrison*, the sole case

---

[2] The defendant has been on notice that Inspector Glumaz was decertified "subsequent to" the August 8, 2025, incident since July 1, 2026, and made no discovery requests related to that decertification.

the defendant cites in support of this request, is inapposite. 888 F.3d 1057 (9th Cir. 2018). In *Garrison*, the government "made grave mistakes in its prosecution of the case by repeatedly failing to timely disclose information to the defense." *Id*. at 1061. The government's failures to disclose material exculpatory information in that case were numerous and flagrant. *Id*. (detailing repeated disclosure failures relevant to multiple key witnesses). The single late disclosure at issue in this case, even if it were a *Brady* violation, blanches in comparison to the disclosure failures in Garrison.[3] Moreover, the government's failures in Garrison occurred both before and *during* trial, a time at which a continuance was no longer available as a remedy. *See also United States v. Garcia*, No. 18-CR-00466-BLF, 2022 WL 1801496, at *3 (N.D. Cal. June 2, 2022), *aff'd*, No. 22-10291, 2025 WL 314126 (9th Cir. Jan. 28, 2025) (denying defendant's request for *Brady* jury instruction where Court's remedial steps reduced or eliminated prejudice). Such is not the case here, where the alleged violation is pretrial.

If the Court were to find a Brady violation, the obvious and appropriate remedy would be a continuance of the trial date sufficient to allow the defendant to adequately prepare for trial. Even where *Brady* material is discovered and disclosed *during* trial, a continuance may suffice to remedy the situation. *Kearns*, 5 F.3d at 1254. The defendant objects to this remedy because he has been on pretrial supervision (with minimal conditions). But if this were enough, a continuance would never be an appropriate remedy. This is not the law. *See Kearns*, 5 F.3d at 1254; *United States v. Taylor*, 802 F.2d 1108, 1118 (9th Cir. 1986) (where there was no bad faith by the Government in failing to produce discovery earlier, a continuance to allow defense counsel time to review the discovery and prepare for trial was appropriate); *United States v. Reid*, 553 F.Supp.3d 882, 893 (W.D. Wash. 2021) (Two-month continuance was sufficient and appropriate to address "serious" discovery errors under both Rule 16 and *Brady*).

Even if the Court were to find a *Brady* violation, the defendant's requested remedies are inappropriate, and the Court should decline to impose them. Rather, the Court should order a modest continuance of the trial date sufficient to allow the defendant to investigate the newly disclosed information.

---

[3] It is notable, of course, that even in *Garrison*, dismissal was not an appropriate remedy.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motion to dismiss.

DATED: July 25, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/

E. WISTAR WILSON
ELI J. COHEN
Assistant United States Attorneys